## UNITED STATES DISTRICT COURT FOR
## THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| **AMBER LIENCZEWSKI[1],** | **CA No.: 1:26-cv-10018** |
| *Plaintiff,* | |
| | **PLAINTIFF DEMANDS TRIAL BY JURY** |
| **vs.** | |
| **SWANSEA PUBLIC SCHOOLS, by and through its superintendent, Scott Holcomb in his official capacity, SWANSEA SCHOOL COMMITTEE by and through Chairperson, Sonya Barbosa in her official capacity only, TOWN OF SWANSEA by and through the board of selectmen, Steven H. Kitchen, Michael Kevin Beaudette, Robert C. Medeiros in their official capacity only, SUPERINTENDENT SCOTT HOLCOMB in his official and individual capacities, DISTRICT DIRECTOR OF STUDENT SERVICES SEAN SCANLON in his official and individual capacities, and PRINCIPAL ROBERT SILVEIRA in his official and individual capacities, SWANSEA MASSACHUSETTS PUBLIC SCHOOLS UNION, by and through its president Frank Murphy in his official capacity, and FRANK MURPHY UNION PRESIDENT, in his official and individual capacities,** | |
| *Defendant.* | |

---

## COMPLAINT AND JURY DEMAND

This action is commenced by AMBER WATSON (hereinafter "Plaintiff") against

SWANSEA PUBLIC SCHOOLS, by and through its superintendent, Scott Holcomb in his official

---

[1] Plaintiff legally changed her name from Amber Watson, which the charge of discrimination was listed under, to Amber Lienczewski on or about December 29, 2025; thus, this is her legal name going forward in litigation.

capacity, SWANSEA SCHOOL COMMITTEE by and through Chairperson, Sonya Barbosa in her official capacity only, TOWN OF SWANSEA by and through the board of selectmen, Steven H. Kitchen, Michael Kevin Beaudette, Robert C. Medeiros in their official capacity only, SUPERINTENDENT SCOTT HOLCOMB in his official and individual capacities, DISTRICT DIRECTOR OF STUDENT SERVICES SEAN SCANLON in his official and individual capacities, and PRINCIPAL ROBERT SILVEIRA in his official and individual capacities, SWANSEA MASSACHUSETTS PUBLIC SCHOOLS UNION, by and through its president Frank Murphy in his official capacity, and FRANK MURPHY UNION PRESIDENT, in his official and individual capacities (hereinafter collectively "Defendants") to remedy and seek relief for unlawful employment practices arising from the Family and Medical Leave Act 29 U.S.C. § 2615 (FMLA) and the Massachusetts Family and Medical Leave Act (FMLA), Pregnancy Discrimination Act 42 U.S.C. § 2000e(k), Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2 and 42 U.S.C. § 2000e-2,  § 1983 Violation of Substantive Due Process – Liberty Interest, and the Massachusetts Fair Employment Practices Act, M.G.L. c. 151B.

## PARTIES

1.  Plaintiff Amber Watson ("Plaintiff") presently resides in the City of Swansea, County of Bristol, within the Commonwealth of Massachusetts, and formerly worked for Defendant at Joseph Case Junior High School in Swansea, Massachusetts.

2.  Defendant Swansea Public Schools ("Defendant" or "Employer" or "Swansea Public Schools") is, upon information and belief, a public school existing in the municipality of Swansea that employed Plaintiff, being sued by and through Superintendent Scott Holcomb in his official capacity (as well as individual capacity listed below) and has a principal office located at 1 Gardners Neck Road, in the Town of Swansea, County of Bristol, within the Commonwealth of Massachusetts.

3.    Defendant Swansea School Committee is being sued by and through its Chairperson, Sonya Barbosa in her official capacity only, and is a state actor, at all times relevant acting under color of state, and that upon information and belief, employed Plaintiff; upon information and belief, the School Committee with a principal office located at 1 Gardners Neck Road, in the Town of Swansea, County of Bristol, within the Commonwealth of Massachusetts.

4.    Town of Swansea, is being sued by and through the three board of selectmen listed on the town's website including Steven H. Kitchen, Michael Kevin Beaudette, Robert C. Medeiros, in their official capacity only, and they are all state actors, at all times relevant acting under color of state, that upon information and belief, employed Plaintiff; the City of Swansea's principal place of business is 81 Main Street, Swansea, County of Bristol, within the Commonwealth of Massachusetts.

5.    Mr. Scott Holcomb was at all times relevant the Superintendent of Swansea School District, is a state actor, that at all times was acting under color of state, and is being sued in his official and individual capacities for applicable counts with individual liability and upon information and belief, resides in Massachusetts.

6.    Defendant Robert Silveira was at all times relevant the JCJHS Principal, is a state actor, that at all times was acting under color of state, and is being sued in his official and individual capacities for applicable counts with individual liability and upon information and belief, resides in Massachusetts.

7.    Mr. Sean Scanlon, was at all times relevant the District Director of Student Services for Swansea School District, is a state actor, that at all times was acting under color of state, and is being sued in his official and individual capacities for applicable counts with individual liability and upon information and belief, resides in Massachusetts.

8.    All of the above defendants are collectively referred to as ("Defendant" or "Employer" or "Swansea Public Schools") as appropriate per count.

## JURISDICTION AND VENUE

9.    This Court has jurisdiction to hear the Complaint pursuant to 28 U.S.C. § 1331.

10.    This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367.  Plaintiff's state claims are so related to Plaintiff's federal claims that they form part of the same case or controversy.  Consideration of judicial economy, fairness, and convenience warrants this Court's exercise of supplemental jurisdiction over Plaintiff's state law claims.

11.    Venue of this action lies pursuant to 28 U.S.C. § 1391(b) because Defendant conducts business in Massachusetts within the judicial district of this Court, as well as because the alleged unlawful practices occurred and/or continue to occur within the state of Massachusetts within the judicial district of this Court.

## ADMINISTRATIVE PROCEDURES

12.    On or about May 5, 2025, Charges of Discrimination were timely filed with the Massachusetts Commission Against Discrimination (MCAD) and co-filed with the Equal Employment Opportunity Commission (EEOC).

13.    On or about October 14, 2025, the MCAD issued its withdrawal of jurisdiction for these claims (MCAD No. 25NEM01414) and the EEOC issued the Right to Sue for the same entities on November 14, 2025 (EEOC No. 16C-2025-01703) enabling this private civil action to be filed.

14.    This Complaint was timely filed after issuance of the withdrawals and Right to Sue notices.

## FACTUAL ALLEGATIONS

15. On or around July 2023, Amber Watson was hired by Joseph Case Jr. High School (hereinafter "JCJHS" or "Employer") as a Paraprofessional (hereinafter "Para") staff member.

16. JCJHS is a Public School located in the Swansea District of Massachusetts.

17. JCJHS is located at 195 Main Street Swansea, MA, 02777.

18. As a Para, Ms. Watson was responsible in helping with instruction, behavior-management, and the physical and emotional health of the students, all under the supervision of a certified teacher.

19. At all times relevant, Ms. Watson's supervisors at JCJHS included Robert Silveira, Principal (hereinafter "Mr. Silveira"), and Gregory Kelley, Assistant Principal (hereinafter "Mr. Kelley").

20. At all times relevant since her hiring, Ms. Watson's performance met or exceeded her employer's legitimate expectations

21. In or around December 2023, during her employment, Ms. Watson became pregnant.

22. In or around early 2024, Ms. Watson informed school leadership that she was pregnant and then notified Principal, Mr. Silveira, that she would be on FMLA when school started.

23. As such, upon information and belief, the following two (2) months were scheduled for summer break at JCJHS.

24. In or around September 2024, Ms. Watson began maternity leave.

25. In or around September 2024, Ms. Watson started FMLA which consisted of twelve (12) weeks of leave.

26. On or around November 1, 2024, during her maternity and FMLA job-protected leave, when she had two (2) weeks remaining, Ms. Watson received a phone call from Mr. Silveira requesting that she return to work two (2) weeks early on or about November 12, 2024.

27. Ms. Watson agreed to resume work at the earlier date, on or about November 12, 2024, despite still having two (2) weeks remaining FMLA leave available, because Mr. Silveira requested she do so.

28. On or about November 12, 2024, Ms. Watson had a meeting scheduled with Mr. Silveira regarding her schedule upon her return from FMLA leave.

29. Upon information and belief, FMLA requires that an employee return to the same or substantially similar job.

30. Ms. Watson's prior position as a Para involved a set schedule and assignments.

31. However, at this meeting, Ms. Watson was informed by Mr. Silveira that she had not yet been assigned a specific role or schedule.

32. Upon information and belief, Ms. Watson was to be a designated "floater" to fill in where and when she was needed.

33. Importantly, at all times relevant in the past, Ms. Watson had a designated role with assignments, and a set schedule, and was not a "floater."

34. Defendants claimed to the commission that Ms. Watson was not a "floater" but pictures of the schedule provided by Mr. Silveira to Ms. Watson that day, and her later communications with coworkers, make it clear that Ms. Watson was a "floater" rather than having a set schedule.

35. Thus, Defendants violated FMLA by the interference by asking her to return early.

36. However, additionally, Defendants retaliated against Ms. Watson by failing to return her to a substantially similar position.

37. Further, later but proximity, Defendants retaliated against Ms. Watson by alleging false allegations and unequal treatment, resulting in her termination/constructive discharge only weeks later.

38. Additionally, during this conversation between Ms. Watson and Mr. Silveira upon her return from FMLA early per his request, Ms. Watson inquired with Mr. Silveira as to a private and clean location to pump her milk, as required by Massachusetts law 151B.

39. Lactation is a pregnancy-related medical condition, and is therefore protected from discrimination by Title VII/the PDA, and 151B.

40. In fact, 151B requires an employer to affirmatively accommodate a lactating person with a private, clean space to pump.

41. More specifically, Ms. Watson asked whether she would be provided a designated private room to pump her milk.

42. During this meeting Mr. Silveira did not identify a location for Ms. Watson to pump; worse, he did not designate time for her to pump.

43. Instead, during this initial meeting with Mr. Silveira on or about November 12, 2024, upon her return from FMLA, Mr. Silveira's new schedule did not designate time to pump.

44. Worse, Mr. Silveira informed Ms. Watson that, "if [she] could find time in [her] schedule to pump twice for 30 minutes each time, [she] should do it" and something to the effect that she "should work it out with the ARCH girls."[2]

45. In effect, Mr. Silveria told Ms. Watson to work out her own time to pump with her coworkers, versus providing direction *and a location* (as required under 151B).

46. Ms. Watson also felt discriminated against due to the lack of time and space provided to pump.

47. Notably, Ms. Watson was not assigned a room or role, and thus, she had no obvious place to express breast milk.

48. For example, the other teachers had their own classrooms and therefore, should they have needed to express breast milk, they had a designated space where they could pump if they needed to.

---

[2] The "ARCH girls" as Mr. Silveira referred to were a group of women Ms. Watson worked with.

49. Ms. Watson understood, from the conversation generally, that she was expected to just "find" a room like she was to "find time in [her] schedule to pump."

50. Ms. Watson had a friend that was out on medical leave that had offered her room.

51. However, her room was not only in the basement which was less sanitary than other locations, but depending where Ms. Watson was in the school, between the walk, setting up the pump, pumping, and returning to duty.

52. Notably, during the meeting with Mr. Silveira a few days prior he had not assigned even the basement room to Ms. Watson; Ms. Watson had to have this conversation herself with her coworker friend.

53. However, depending where she was in the school, the walk to that basement room was long.

54. Only a few days later, on or about November 15, 2024, Ms. Watson was asked by Heather Montigny, JCJHS Secretary (hereinafter "Ms. Montigny"), to cover an 8th grade Science class.

55. Following this 8th grade science class, on or around November 15, 2024, Ms. Watson had a scheduled "prep" period.

56. Notably, Defendants denied to the Commission that paras are asked to cover classrooms.

57. However, once again, Ms. Watson has text evidence demonstrating this is done often at JCJHS.

58. During this "prep" period, Ms. Watson had planned to express her milk with a mechanical breast pump in that room.

59. Again, she had been given no direction – or directives – by Principal Mr. Silveira as to where or when to pump and that she should just 'figure it out.'

60. Ms. Watson considered going to the basement for more security and sanitary reasons, but due to covering for an actual classroom, she felt she did not have time to get all the way to the basement room, pump, and get back in time for the next class.

61. To ensure privacy, Ms. Watson went to talk to a nearby teacher, Ms. Damaris about pumping in that room.

62. Ms. Damaris assured Ms. Watson that "nobody comes up [here]" and thus, she should just "lock the door."

63. Ms. Watson, thus, followed the teacher's suggestions.

64. Ms. Watson locked the door for privacy so that she could use her breast pump machine.

65. Ms. Watson pumped successfully once that morning.

66. Then, later that day, when pumping, suddenly, Ms. Watson noticed the door was being unlocked.

67. Ms. Watson announced loudly that the room was occupied and she was using her breast pump.

68. The principal, Mr. Silveira, proceeded to unlock the door with his master key to the room Ms. Watson was located in, which she had deliberately locked to pump.

69. Mr. Silveira proceeded to enter the room.

70. Ms. Watson's breasts were exposed while she was using her machine, and she was positioned behind a desk.

71. Notably, all lights were on and Ms. Watson was in plain view, as texts with coworkers prove.

72. Despite that Defendants claimed in their commission position paper that the lights were off and Mr. Silveira did not see her, and that once he did, he left right away, which is not true.

73. In fact, despite Ms. Watson announcing herself, sitting there half-naked, Mr. Silveira proceeded to walk around the classroom she was in.

74. Mr. Silveira seemed uncomfortable but yet, would not leave.

75. Mr. Silveira proceeded to try to have a full conversation with Ms. Watson and just kept talking, despite her continued, and increasingly urgent protest, that she was pumping and he needed to leave.

76. Ms. Watson continued to try to get Mr. Silveira's attention to stop walking around the room trying to talk to her but he just kept speaking.

77. Mr. Silveira proceeded towards Ms. Watson, stopping 10 or less feet directly in front of her.

78. Ms. Watson was in complete shock by Mr. Silveira remaining in the classroom.

79. Ms. Watson's breasts were exposed because she was using her pump so she tried to cover up.

80. Ms. Watson continually stated to Mr. Silveira, "I'm using my breast pump."

81. Mr. Silveira finally left.

82. Ms. Watson felt humiliated and uncomfortable that Mr. Silveira had just seen her exposed and pumping.

83. Ms. Watson contemporaneously text her coworkers about Mr. Silveira walking in, stating in pertinent part, "

84. Following Mr. Silveira's extended intrusion while Ms. Watson was pumping, she expressly complained to Mr. Silveira about this event.

85. Ms. Watson complained to Mr. Silveira about his walking in and not having provided a secure and cleanly place to pump.

86. It was after this complaint that Mr. Silveira assigned Ms. Watson to pump in the basement office of the coworker friend of Ms. Watson's that was on medical leave.

87. In fact, Mr. Silveira not only represented that the room would not be accessible by anyone and he *gave her the key to the room off of his keychain.*

88. Ms. Watson still has this key.

89. Mr. Silveira represented that with that key, *no one* had access to the room as the teacher also did not want anyone in the room except Ms. Watson while she was on leave.

90. Mr. Silveira represented that only he and the custodians had a key to the room and he would advise that this room was off limits.

91. Mr. Silveira represented that this room in the basement was a private space.

92. Despite the room being far away from most locations in the school and in the basement, which was less preferable, Ms. Watson accepted the room.

93. Ms. Watson felt she would finally have a designated room to pump privately.

94. Mr. Silveira represented, as the principal of the school, that Ms. Watson would not be walked in on again while pumping.

95. Mr. Silveira was wrong.

96. Within only days after this conversation, on or about November 21, 2024, while Ms. Watson was expressing milk with her breast pump machine in the designated space that Mr. Silveira specifically assigned her in the basement which he represented would be private and that no one had a key to except him and the custodians, Mr. John Menke, *not* a custodian, and instead, the Media Center Secretary (hereinafter "Mr. Menke"), abruptly unlocked the door and interrupted Ms. Watson while pumping.

97. Ms. Watson was baffled and quite distressed, yet again, by being intruded on in a room that was supposed to be secure but for Mr. Silveira and the custodian's keys, and Mr. Silveira's representation that he would ensure it would be private.

98. As Mr. Menke continued opening the door, Ms. Watson announced her presence.

99. Ms. Watson explicitly and loudly announced, "[g]et out! I'm using my breast pump!"

100. Despite this announcement, Mr. Menke proceeded to open the door completely, observing Ms. Watson in a chair located in the corner of the designated room.

101. Again, as with Mr. Silveira, Ms. Watson's breasts were exposed as Mr. Menke walked in.

102. After a moment, Mr. Menke closed the door and left.

103. Ms. Watson was in utter shock.

104. Unbelievably, then only seconds later, Mr. Menke re-opened the door.

11

105. Ms. Watson was in complete and utter disbelief.

106. Mr. Menke entered the room and lingered for a moment, only a few feet away from where Ms. Watson was with her breasts exposed as she pumped.

107. Ms. Watson again, firmly, explicitly, yelled "get out!"

108. Mr. Menke did not leave.

109. Instead, he took the time to state that he thought the room was the "storage closet."

110. Mr. Menke then closed the door and proceeded out of the room.

111. Due to this event, Ms. Watson again felt humiliated and uncomfortable that Mr. Menke had just seen her pumping, in addition to Mr. Silveira, only a few days prior.

112. Distressed by this incident, Ms. Watson was left feeling unsettled.

113. Importantly again, only a few employees had keys to Ms. Rocha's room and Mr. Silveira had promised that all staff were well aware of Ms. Rocha, the room Ms. Watson was in, did not want anyone entering her room and that Ms. Watson was pumping in that room.

114. Thus, no one should have entered, especially with a key.

115. Moreover, it was even more peculiar that Mr. Menke came into that room and claimed to think it was a storage closet when it was clearly not and that was a known fact to employees.

116. Ms. Watson contemporaneously reported this event to her coworkers via text, reporting Menke entering the room, specifically stating, "[h]ow is this happening, first Bob [Silveira] now Menke (emojis for crying, sad, and a baby bottle) and I'm in the freaking dungeon. He said he thought it was a storage room."

117. After this event Ms. Watson again reported the event to school leadership including the school Vice Principal Gregory Kelley ("Mr. Kelley").

118. In her complaints to school leadership, Ms. Watson called it "absurd" that she had been told by Principal Silveira that she would have privacy and that she needed "security" that she could pump alone.

119. Ms. Watson worked another several days, petrified of pumping and seeing nothing done as to her complaints about her lack of assignments, pumping space security, and the men that had walked in on her and lingered.

120. Just after that, Thanksgiving break started.

121. At that time, Ms. Watson had only been back at work from FMLA for two weeks and not only had she had not only not been given a set assignment, or safe place to pump, but during that short timeframe, two different men had walked in on her while she pumped and Ms. Watson reported both to her coworkers and to the Principal, Mr. Silveira and the Assistant Principal Mr. Kelley.

122. Ms. Watson felt that this treatment, following FMLA maternity leave and having a pregnancy-related medical condition, was unfair, discriminatory, and retaliatory.

123. However, matters became much worse immediately after returning from Thanksgiving Break.

124. In fact, the very next week after Thanksgiving break, on or about December 5, 2024, Ms. Watson was suddenly and falsely accused of wrongdoing, which was not true, as verified by video.

125. By way of brief background, the Paras at JCJHS support students working toward meeting academic and behavior goals, including students with disabilities such as autism.

126. At times, students with disabilities such as autism can display unwanted behaviors due to being triggered by something in their environment.

127. For example, an autistic student with sensory issues can experience a "meltdown"—which is an involuntary response to a nervous system overload—when they are triggered by a stressful sensory input such as a door slamming or an unpleasant odor.

128. Meltdowns can then result in unwanted behaviors such as hitting and kicking, elopement, or withdrawing.

129. It is important to deescalate a meltdown as quickly as possible, as they can be dangerous for the individual experiencing them and others.

130. Paras like Ms. Watson are taught to handle meltdowns and other manifestations of unwanted behavior through their trainings on Crisis Prevention Intervention ("CPI") training and certification.

131. Ms. Watson has been CPI certified since 2005.

132. CPI trains those who care for students methods of de-escalation and the safety of students, often with developmental or learning disabilities and behavioral issues.

133. CPI training provides educators with a set of maneuvers that should be used to address certain behaviors.

134. For example, if a student is attempting to hit someone, the appropriate maneuver would be to block the hit with an open hand rather than grabbing hold of the student's arm or wrist with a closed fist.

135. Moreover, once Plaintiff started in this position as a para, she worked with other CPI trained educators and these educators shared the most used maneuvers with certain students.

136. At the time of the December 5, 2024 incident, Ms. Watson had been a Para for about six (6) years and CPI trained and certified since 2005 and had been involved in many situations when she supported students with autism and/or sensory issues who were engaging in unwanted behaviors.

137. During her time at JCJHS, there was a particular student who struggled with sensory output as well as sensory input and had a particular issue with transitioning down the hallway when it was loud.

138. This child, O.M., was, the only child upon information and belief, who spent her full day in one room, due to her difficulty transitioning in the hallways because of her sensory, and behavioral issues related to her disability.

139. However, other paras and Ms. Watson had to help O.M. transition in and out of school at the start and end of the day.

140. Note that due to O.M.'s frequent meltdowns, and her profound autism, upon information and belief, sometimes these transitions would take many minutes up to an hour.

141. Note that all Paras, including Ms. Watson, had extensive experience handling O.M.'s difficult transitions, as well as the maneuvers used according to CPI.

142. Further, Ms. Watson was usually just called in to help, and was rarely, if ever, the primary Para performing the transitions, and not alone.

143. On that day, just after Thanksgiving break, on or around December 5, 2024, JCJHS' Secretary, Ms. Heather Montigny (hereinafter "Ms. Montigny") texted Ms. Watson inquiring if she was available to cover for Ms. Natalie Salvador (hereinafter "Ms. Salvador"), another Para staff member, in assisting student O.M.

144. On that day, like many others, O.M. was having difficulty transitioning through the common areas.

145. O.M. is profoundly autistic and suffers from debilitating sensory overload with sensory processing challenges, including but not limited to, being out in open spaces as well as being alongside her peers and loud noises.

146. In fact, this student's IEP notes that she can have a very difficult time transitioning.

147. Specifically, the Paras try to get O.M. through the halls as quickly and safely as possible and maintain her momentum.

148. If the momentum is lost, O.M. will "freeze"; when she freezes, this only exacerbates her anxiety as she would prefer to not be in common areas.

149. Further, when O.M. freezes, she tends to exhibit, unsafe behavior by sitting/laying down in the halls, stairwells, entryways, which can be highly unsafe for her and others during passing periods when the halls are full of other students.

150. Importantly, that morning, Ms. Watson – who had frequent contact with O.M.'s mother - was informed by O.M.'s mother that her child was having a "difficult morning" and the mother said she did not "know what the day was going to look like."

151. O.M.'s mother told Ms. Watson this in front of another Para, Ms. Karen Lloyd (hereinafter "Ms. Lloyd"), who ended up helping Ms. Watson with the transition of the student to class.

152. On that day on or about December 5, 2024, O.M. needed to be escorted from the handicapped entrance at the rear of the building to the second floor where her classroom was located.

153. From this prior experience, Ms. Watson knew that part of the Paras' duties were to wait and escort O.M. upon arrival to school.

154. Ms. Watson also knew that because O.M. is prone to crippling anxiety when being out in open spaces, the goal is to get her as quickly and safely as possible to her next class.

155. Upon arriving to meet O.M., at first, Ms. Lloyd accompanied Ms. Watson in getting O.M. to class.

156. Ms. Watson, along with the assistance of at first one, and then later, two other Paras, Ms. Lloyd and Ms. Carol Pelletier (hereinafter "Ms. Pelletier"), had to transition O.M. successfully to the appropriate classroom.

157. On that day, while escorting O.M. to her classroom, O.M. dropped herself to the floor and sprawled across the hallway, several times, creating an unsafe situation for her as well as her peers.

158. As Ms. Lloyd and Ms. Watson were tending to O.M., Ms. Pelletier came to assist with O.M.'s behavioral issue.

159. This exchange took roughly approximately forty (40) minutes, as O.M. was having extreme sensory difficulties at this time.

160. From recollection of the events, *and from Ms. Watson having been eventually shown the video* which confirmed Ms. Watson (and the other Paras) did nothing wrong, are as follows.

161. During this difficult transition the morning of December 5, 2024, O.M. sat on the floor on the first floor, then sat on the stairs in the stairwells when transitioning to the second floor, then again sat on the floor outside of the history classrooms in the eighth grade hallway and sprawled across the floor in the hall in front of the elevator between the eighth grade and seventh grade hallways.

162. The intended classroom is midway down in the seventh-grade hall.

163. For O.M.'s safety, and that of others – as well as the need to transition O.M. – O.M. had to be moved from sitting or laying on the floors in a high traffic area which creates a risk to O.M. and others.

164. Thus, during these events, therefore, the Paras had to use appropriate tactics to transition O.M. toward her classroom.

165. During all of these events, the tactics used by the three Paras, including Ms. Watson, were tactics in line with CPI training/certifications, and were tactics used by Ms. Watson's colleagues who had worked with O.M. for the three years that she been a student at JCJHS.

166. To be sure, all three Paras, including Ms. Watson, used typical procedures and maneuvers to address O.M.'s particularly difficult behavioral challenges that day.

167. After the difficult time with O.M., and she arrived at her room, O.M. was fine.

168. In fact, O.M. went to her classroom and ended up having a good day; there were no further issues once she was in her preferred, sub-separate room.

169. Further, nothing seemed off with Ms. Lloyd or Ms. Pelletier with respect to their experience of the behavioral issue with O.M. that morning, as it was not uncommon.

170. In fact, both Ms. Lloyd and Ms. Pelletier went on with their days as normal, just as Ms. Watson did.

171. In short, there was nothing concerning about the event other than that O.M. had a particularly difficult time in that transition, which again, was not uncommon.

172. Moreover, after the difficult time with O.M., no other staff member raised any issues and everything seemed normal with the handling of the situation with O.M.

173. Later that same day, on or around the afternoon of December 5, 2024, Ms. Watson also was directed to escort O.M. for dismissal, out to her mother, which went much better.

174. However, after the dismissal, and Ms. Watson being directed to escort O.M. the second time that day, matters changed drastically out of the blue.

175. Specifically, right after dismissal, Ms. Montigny sought Ms. Watson out and requested that she meet Mr. Silveira in his office for a meeting.

176. Ms. Watson entered Mr. Silveira's office, he was sitting at his desk; however, he was not alone.

177. Beside Mr. Silveira was Mr. Sean Scanlon, School District Director of Student Services (hereinafter, "Mr. Scanlon").

178. Further, standing beside the entryway of the door was Mr. Frank Murphy, Teachers Union President (hereinafter, "Mr. Murphy").

179. Ms. Watson had never even met Mr. Murphy at any time prior.

180. In fact, there was a separate union representative within the building already, but that representative was not present.

181. Instead, the Union President was present.

182. Ms. Watson was instructed by Mr. Silveira to enter the room and have a seat but to close the door behind her.

183. Ms. Watson immediately felt something was very unusual.

184. After Mr. Silveira re-introduced Ms. Watson to Mr. Scanlon, whom she had met a couple of times in the past, Mr. Scanlon stated firmly that "[i]t had come to [their] attention that there was an issue in getting the student to class."

185. Confused by this statement, Ms. Watson responded, "I'm unaware of what the issue was."

186. Then Mr. Scanlon stated that they reviewed the video surveillance, which he claimed showed just Ms. Watson and O.M.; he did not even make mention of the other two Paras that were equally involved in O.M.'s transition that morning.

187. Mr. Scanlon then said that Mr. Silveira had some concerns and that he had reported those to Mr. Scanlon.

188. Mr. Scanlon said he watched the video himself and determined there would need to be an investigation.

189. Mr. Scanlon stated the investigation was *only as to Ms. Watson's actions and did not even mention the other two Paras who were equally involved in the transition of O.M. on that video*.

190. Mr. Scanlon then informed Ms. Watson that she would then be put on paid administrative leave effectively immediately pending an "investigation into the incident."

191. Ms. Watson was shocked.

192. In response, Ms. Watson asked Mr. Scanlon, "[i]nvestigation of what?"

193. Ms. Watson was very confused about what was going on.

194. Mr. Scanlon responded, the "issues getting the student to class."

195. JCJHS staff members and management, including Mr. Silveira, Mr. Scanlon, and Mr. Murphy, were well aware of O.M.'s difficulty transitioning to classes and previous instances when O.M. engaged in unwanted behaviors while transitioning to classes like she had that day.

196. Ms. Watson was therefore confused by the accusation and the need for an "investigation."

197. Ms. Watson responded, "[t]here are issues with O.M. daily due to her sensory issues."

198. Mr. Murphy intervened and said that they would be able to discuss this further outside of the building.

199. Ms. Watson was then asked by Mr. Silveira to gather her belongings and vacate the building, with instructions not to speak with any members of staff while doing so.

200. Also, Mr. Silveira requested that Ms. Watson not attend that afternoon's home game for the girls' basketball team, that evening of December 5, 2024, *despite the fact that Ms. Watson's own daughter* is part of that girls' basketball team.

201. Baffled, Ms. Watson proceeded to leave Mr. Silveira's office and collect her things.

202. Ms. Watson left the building of JCJHS.

203. Upon leaving the building, Mr. Murphy approached Ms. Watson in the parking lot where her vehicle was located.

204. It was raining, thus making the conditions difficult to speak outside, so Mr. Murphy suggested they relocate to Ms. Watson's car where it would allow them some privacy to discuss what transpired.

205. Mr. Murphy got into Ms. Watson's car and they spoke.

206. Upon speaking, Mr. Murphy assured Ms. Watson that "this type of event" calls for "a procedure" but that it would "go quickly."

207. Sitting in her vehicle, Ms. Watson turned to Mr. Murphy and asked for further information on what the school leadership believed had transpired.

208. Mr. Murphy stated that he did not have many details about the incident, despite there being video of the event.

209. Mr. Murphy did, however, tell Ms. Watson, "[t]hat there was a separate issue with another member of the staff and due to that event, it required Mr. Silveira to review all video surveillance footage."

210. The separate incident in question did not involve Ms. Watson.

211. Mr. Murphy relayed that while Mr. Silveira was reviewing surveillance footage of students being transitioned to each of their classes, he deemed the manner "in which it was being done," with respect to O.M., inappropriate.

212. Yet, at that time – and for at least a notable period of time after the event and, upon information and belief only after Ms. Watson complained that she and the other two Paras did the exact same maneuvers and she was the only one being put out of work and investigated – the other Paras were not even questioned.

213. In short, Mr. Silveira saw Ms. Watson on the video and immediately deemed a need for an investigation into *only her* and ignored the fact that first, nothing improper had been done, and

second, that Ms. Watson was one of three performing the same types of maneuvers during the

multiple times that morning that O.M. sat or laid on the floor during that transition.

214. It is also notable that despite the fact that by dismissal, Mr. Silveira had already "determined"

that there was an "issue" so serious as to O.M.'s treatment requiring that Ms. Watson be

placed on leave and investigated, *that Ms. Watson had been directed to escort O.M. a second*

*time at dismissal that day.*

215. It is also notable that if Mr. Silveira determined that Ms. Watson's behavior (which again was

the same as the other two Paras) was so serious it required immediate administrative leave and

an investigation, that DCYF was never called given that the school is a mandated reporter.

216. During the conversation with Mr. Murphy in Ms. Watson's car, Ms. Watson asked more

questions as none of the situation made sense.

217. Mr. Murphy, the Union President, just continued to state that after Mr. Silveira reviewed the

footage, he felt "compelled" by what he had seen to report his findings to Mr. Scanlon.

218. Again, the other two Paras involved in O.M.'s transition with Ms. Watson, Ms. Lloyd and Ms.

Pelletier, were not, upon information and belief, even questioned for a long period of time and

until after Ms. Watson complained about her sole targeting.

219. Moreover, upon information and belief, Ms. Lloyd and Ms. Pelletier were not written up,

although the school claimed they were in its position paper, which made no sense because

there is an ongoing text chain with this group and nothing was ever said by the other Paras

about writeups.

220. Finally, Ms. Watson was the only one of the three Paras that was put out on administrative

leave, investigated, and later, threatened with reporting her to DCYF if she did not sign a

Non-Disclosure Agreement ("NDA") and resign.

221. Further, in addition to the fact that the two other Paras, Ms. Lloyd and Ms. Pelletier were involved in the morning transiting of O.M. and used the same tactics or maneuvers as Ms. Watson, according to their training, Ms. Watson had seen other Paras regularly use the same techniques when O.M. was having a difficult time, including but not exclusive to, Ms. Salvador, who is O.M.'s main Para and Kara Bowden.

222. Importantly, no other Para had ever been investigated or put on administrative leave for using the techniques used by Ms. Watson and the other two Paras with O.M. that morning, upon information and belief.

223. On the video, all three Paras were seen doing that maneuver on that day.

224. Yet, Ms. Watson was the only one to be investigated and put on administrative leave.

225. As Mr. Murphy and Ms. Watson closed out their conversation that day of December 5, 2024, in Ms. Watson's car, Mr. Murphy promised that he would "hopefully receive more information in the following days" and to "go home" in the meantime.

226. Ms. Watson received no correspondence from the school administration or members of its staff for a week.

227. On or around December 11, 2024, Ms. Watson received a phone call from Ms. Montigny, Mr. Silveira's secretary, asking if she would be available to come in.

228. Ms. Watson agreed to the meeting and her union representative was again to be not the representative normally provided in that building but, instead, Mr. Murphy, the Union President.

229. On or around December 11, 2024, Ms. Watson arrived at JCJHS for the meeting as requested by Mr. Silveira.

230. Before entering the building, Mr. Murphy stated to Ms. Watson that she would need to "share [her] account of the incident."

231. Ms. Watson questioned Mr. Murphy, "what exactly did they want to know."

232. Mr. Murphy then informed Ms. Watson that, "they already outlined this in a letter that was sent to you."

233. In response, Ms. Watson told Mr. Murphy that she had received no letters from the administration.

234. Mr. Murphy then told Ms. Watson that the "letter went out on Monday, December 9, 2024," which was only four (4) days after the incident.

235. To be clear, Ms. Watson had not received the letter Mr. Murphy was referring to that he said the school sent.

236. *At the meeting* Mr. Murphy produced a copy of the letter that he was referring to which was a notification of paid administrative leave and formal hearing with intent to suspend or terminate her.

237. This letter was sent directly from the Superintendent of Schools, Mr. Scott Holcomb (hereinafter, "Mr. Holcomb") and was addressed to Ms. Watson.

238. This letter began by stating that it had been brought to Mr. Holcomb's attention that certain allegations had been made regarding Ms. Watson's conduct in the workplace as reported by Mr. Silveira.

239. Further, in this letter, it outlined three specific maneuvers the Paras did in the transfer of O.M.

240. The letter stated Ms. Watson allegedly, "dragged a rug with a student sitting on it, picked up said student from a sitting position by putting [her] arms under said student and carrying [her] down the hall in the same fashion."

241. The letter further alleged, "[o]nce said student was sitting on the floor, it was noted that you slid said student along from behind by pushing with your knee and upper leg."

242. Lastly, this letter stated, "[d]uring the investigation, you have a right to be represented by an attorney and to have a union representative present."

243. After reading the letter and during this conversation with Mr. Murphy, Ms. Watson specifically stated to Mr. Murphy, "I do not have a lawyer, should I continue going into this meeting?"

244. It was then that Mr. Murphy assured Ms. Watson that it would be "okay."

245. In fact, Mr. Murphy stated to Ms. Watson that, "[h]e had never seen a lawyer brought in at this stage."

246. Ms. Watson trusted Mr. Murphy's assurances as to not needing legal representation, so she agreed to continue into the meeting with just her union representative.

247. Mr. Murphy and Ms. Watson entered Mr. Silveira's office.

248. Mr. Scanlon and Mr. Silveira were both present and seated at a desk.

249. During the meeting, Mr. Murphy asked Ms. Watson to share her recollection of the alleged incident that took place on or around December 5, 2024, with the transition of O.M. getting to class.

250. Ms. Watson proceeded to give her detailed account, per Mr. Murphy's request, despite the event being on video.

251. Ms. Watson began to explain each procedure or maneuver that she and the other Paras took with O.M. the morning on or around December 5, 2024.

252. In fact, Ms. Watson specifically pointed out that two other Paras, Ms. Lloyd and Ms. Pelletier, who assisted her with the transfer of O.M., were involved in all the actions taken with O.M. that morning, but that none did anything improper.

253. Moreover, Ms. Watson stated to Mr. Silveira and Mr. Scanlon that she had witnessed those specific procedures or maneuvers used, frequently, by the other Paras who were typically assigned to O.M.

254. Mr. Silveira then referred again to the video surveillance footage he claimed to have reviewed on or about December 5, 2024

255. Following Mr. Silveira's remark about having seen video surveillance footage of the alleged incident, Ms. Watson requested to see the video.

256. In fact, Ms. Watson had to insist on seeing the video that they were referring to which allegedly provided the sole basis for all allegations against her.

257. Ms. Watson stated to Mr. Silveira and Mr. Scanlon that, "I am on that video, I would like to see it."

258. In response, Mr. Scanlon said "you can certainly ask."

259. Ms. Watson said, "I am asking."

260. Mr. Scanlon said "ok."

261. Ms. Watson said, "you can either show me or I can submit a public records request, but either way you need to show me."

262. Mr. Scanlon and Mr. Silveira would not let Ms. Watson watch the video.

263. Ms. Watson then stated that she no longer felt comfortable answering any questions they may have about the alleged incident that occurred on or around December 5, 2024, without seeing the video which was the basis for all of the allegations against her.

264. Mr. Scanlon then responded by saying that he was going to "run [her] request by the superintendent and the school's attorney" and would get back to her.

265. The meeting then concluded.

266. Mr. Murphy and Ms. Watson proceeded to leave the meeting.

267.  Following this meeting, specifically on or about December 11, 2024, Ms. Watson finally received the letter that Union President Murphy showed her during the meeting.

268.  Another approximately five (5) more days went by and Ms. Watson became increasingly distressed as she heard nothing from the school about her right to see the video which demonstrated the basis for all allegations against her.

269.  During that time, Ms. Watson sat out of work not knowing what was going on and not understanding the allegations against her.

270.  On or around December 16, 2024, Ms. Watson could not wait anymore; it was extremely stressful sitting out of work not knowing what was going on, especially with a newborn and other children at home and the need for her job.

271.  Thus, on December 16, 2024, Ms. Watson texted Mr. Murphy asking if he had heard anything back regarding the investigation.

272.  Mr. Murphy replied informing Ms. Watson that he had not heard anything back from the administration regarding the investigation.

273.  Two (2) more days went by as Ms. Watson sat out of work, in significant distress, not knowing what was going on.

274.  On or around December 18, 2024, Ms. Watson finally received a phone call from Ms. Montigny requesting her to schedule a meeting.

275.  Ms. Watson responded to Ms. Montigny that she would send an email.

276.  On or around the afternoon of December 18, 2024, Ms. Watson sent the following email to Mr. Silveira, Mr. Scanlon and Mr. Murphy:

"Good afternoon, I've just gotten off the phone with Heather Montigny, a dear friend and beloved secretary at Joseph Case Junior high school. She had asked if I would be available tomorrow at 1PM to meet to look over the video footage that I had requested a viewing of. Unfortunately, due to an accident that my son had yesterday at school I am unable to leave him at that time and am not available. As I discussed with Mrs. Montigny, I am uncomfortable

due to the nature of our relationship and her role with our employer and going forward would prefer that communication be made by email, traditional mail or communication through administration building staff or Mr. Silveira himself. This way I can continue to keep this investigation private and maintain a separation of both my personal and professional relationships."

277. In response to this email, Mr. Silveira noted that moving forward all communication would be conducted via email.

278. In his email, Mr. Silveira also requested Ms. Watson's availability for December 20, 2024, to review video surveillance footage which she had requested to view over a week prior, on or about December 11, 2024.

279. Ms. Watson responded that she agreed to the meeting on or around December 20, 2024, and stated that Mr. Murphy would again be her union representative for this meeting.

280. Prior to the meeting, Ms. Watson had questioned Mr. Murphy if she should also be accompanied by legal representation.

281. Again, Mr. Murphy assured Ms. Watson that would not be necessary.

282. On or around December 20, 2024, at or around 8:30 a.m., Mr. Murphy, Mr. Scanlon, Mr. Silveira, and Ms. Watson gathered at JCJHS to review the video surveillance footage she had requested to see over a week prior.

283. Notably, Defendants' claimed untruthfully in response to paragraph 125 of their position paper with the commission that "O.M would not go through the same handicap door following the incident."

284. Such a claim is untrue because on December 20, 2024, upon arriving at her meeting, Ms. Watson saw O.M. enter through that same handicap door, without issue.

285. Within the meeting, Ms. Watson got ready to view the video – finally.

286. Upon information and belief, Mr. Murphy had not seen video surveillance footage of the alleged incident that took place on or around December 5, 2024, until that moment in time.

287. While reviewing the video surveillance footage, Ms. Watson thoroughly narrated and explained each maneuver that she was taking to aid O.M. successfully in transitioning through the halls to the next class.

288. Furthermore, there were several different videos, each with different angles from various camera locations on that December 5, 2024, difficult transition had taken place across various parts of the school.

289. Ms. Watson watched the videos intently.

290. Specifically, Ms. Watson repeatedly asked for each video to be rewound and she rewatched them.

291. Importantly, the video footage clearly showed the two other Paras, Ms. Lloyd and Ms. Pelletier, along with Ms. Watson, all jointly assisting O.M. with the same maneuvers, jointly trying to assist O.M. to her class safely and appropriately.

292. After reviewing the surveillance footage, Mr. Murphy then stated to both Mr. Scanlon as well as Mr. Silveira that he was "unsure" as to why Ms. Watson was "placed on administrative leave" because he found "nothing of note" to be a "cause for concern" after reviewing the videos.

293. In fact, Mr. Murphy commended the staff members, including Ms. Watson, for their "exemplary patience in what he witnessed to be a very difficult situation."

294. Both Mr. Scanlon and Mr. Silveira sat straight-faced and cold, in silence.

295. Before the meeting concluded, Mr. Scanlon responded to Mr. Murphy dismissively that he would need to discuss it with the superintendent of the school system.

296. The meeting concluded.

297. Ms. Watson had even more questions as to why she was on administrative leave after seeing the video and hearing Mr. Murphy's reaction.

298. The school was just about to start winter break at JCJHS so Ms. Watson was concerned she would not know of a possible outcome until school was back in session.

299. It distressed Ms. Watson greatly to go through the winter break and the holidays still not knowing what was going to happen to her job that she needed.

300. Moreover, after seeing the video, and the more time that elapsed, Ms. Watson had more questions than ever about why she was on administrative leave and being threatened with termination, pursuant to the letter she was shown during the last meeting and received on or about December 11, 2024.

301. In fact, during all of break, Ms. Watson never received any communications or correspondence from the school regarding the alleged incident that took place on or around December 5, 2024.

302. At the end of break, which marked approximately *a month* on administrative leave, Ms. Watson finally heard from Mr. Murphy.

303. Specifically, on or around January 2, 2025, Ms. Watson received a phone call from Mr. Murphy.

304. During this phone call, Mr. Murphy stated that he had heard from Mr. Scanlon and that a letter of termination would be sent certified mail to Ms. Watson.

305. In shock, Ms. Watson asked Mr. Murphy on what grounds she was being terminated.

306. Mr. Murphy oddly stated that "they are still deciding."

307. Furthermore, Mr. Murphy stated that they were urging Ms. Watson to send in a letter of resignation as opposed to her being terminated.

308. In disbelief, Ms. Watson responded to Mr. Murphy's statement, questioning, "why would I quit my job?"

309. Ms. Watson explained to him that she liked her job and wanted to remain at JCJHS as a Para.

310. Ms. Watson not only loved her job and needed the income, but her kids went to that school, she had been the basketball coach, and the job was a short commute.

311. Not only would it be difficult to find a job as close to her home as that job, but if terminated (or even if she resigned under those circumstances), her reputation would be permanently harmed given the false allegations had become public by then.

312. Ms. Watson questioned Mr. Murphy about her options as she would not resign, did not want to be fired, and did not understand the grounds for any such termination.

313. Moreover, according to Mr. Murphy, even the school was "still deciding" the basis for the termination.

314. None of it made any sense to Ms. Watson and caused extreme distress.

315. Plaintiff believed the threat of termination, starting with the false allegations from December 5 2024, was retaliation for having taken FMLA, having requested accommodation to express breast milk, in retaliation for reporting the sexual harassment of Mr. Silveira and Mr. Menke by their actions walking in and lingering as Ms. Watson pumped breast milk, and thus, the December 5, 2025, allegations of wrongdoing and all subsequent events involving Defendants were pretextual to remove her to cover up their intent.

316. Mr. Murphy just kept repeating himself, stating that "they would be sending [] a letter of termination if [she did not] resign."

317. Mr. Murphy's repetitive statement felt and sounded like a threat by her own union president, a union which is obligated to protect employees' rights.

318. Mr. Murphy furthermore finally added more detail, disclosing that "they wanted [her] to consider voluntary resignation and to be willing to sign a non-disclosure agreement."

319. Mr. Murphy specifically noted that the school requested that Ms. Watson "put [her] voluntary resignation in writing."

320.  Worse, during this conversation, Mr. Murphy began to blatantly 'sell' Ms. Watson into quitting and signing an NDA in exchange for *not being reported to "state agencies" (i.e. DCYF)* and having the school not contest her unemployment.

321.  Ms. Watson was shocked as to all of those conditions and what seemed like a clearly odd way to terminate or remove an employee – with threats and inducements.

322.  Further, Ms. Watson was particularly shocked by the threat of the school reporting her to DCYF <u>that long after the event</u>[3] since the school was a mandatory reporter – meaning, if an event warranting DCYF involvement had occurred on December 5, 2024, *the school had a duty to report it to DCYF weeks prior to that threat* but did not; it only threatened to do so as a threat *if* Ms. Watson refused to concede to resigning and signing an NDA.

323.  At that point, Mr. Murphy did not explain the other terms in the soon-to-come email, which *also* required Ms. Watson to not only quit, sign an NDA, but also to agree the school was not liable to her *and sign a general release – where Ms. Watson would be agreeing to waive all legal claims <u>she had against the school for the harm Defendants caused <b>her</b>.</u>*

324.  Mr. Murphy, in line with a later January 3, 2025, email from Mr. Scanlon, continued to 'sell' Ms. Watson on resigning by stating that not only would the school not report her and not contest her unemployment benefits, the school would write her a "neutral" letter of recommendation.

325.  Ms. Watson was shocked by the blatant threat to push Ms. Watson out after doing nothing wrong.

326.  This was all shocking especially because in several prior conversations with Mr. Silveira, he had referred to Ms. Watson as a "phenomenal person and great with children."

---

[3] Notably, from a legal perspective, this unconscionable threat was reduced to writing in a January 3, 2025, email to Ms. Watson, in her possession, which copied Mr. Murphy and Superintendent Mr. Holcomb.

327. Notably, in Defendant's position paper to the commission it denied the above commendation of Ms. Watson.

328. However, unless the school has since altered its version of Ms. Watson's performance review, it stated this *same commendation* of Ms. Watson in her *annual review* in addition to Mr. Silveira stating this to Ms. Watson verbally.

329. As the conversation continued with Mr. Murphy that day on or about January 2, 2025, Ms. Watson was extremely upset and confused by Mr. Murphy's statement regarding possible reports to DCYF and questioned what the school even had to report based on Mr. Murphy's and her collective viewing and recollections of the actual video.

330. Mr. Murphy stated that he "did not know what they would report."

331. The fact that even Mr. Murphy did not know what the school was alleging Ms. Watson did wrong, after he had viewed the video and responded – in front of Mr. Scanlon, Mr. Silveira, and Ms. Watson, on December 20, 2025, that he saw no issue – while Mr. Murphy relayed to Ms. Watson that if she did not resign that the school would report her to DCYF, was even more confusing.

332. Ms. Watson reminded Mr. Murphy that they were mandated reporters and as such, were legally obligated to report any known or suspected abuse of a child *long before that point in time*.

333. Specifically, Ms. Watson told Mr. Murphy that because they were mandated reporters, if such abuse was seen, they had a legal obligation to report it to DCYF within 48 hours.

334. Furthermore, Ms. Watson stated it should have been reported if, in fact, the alleged abuse had occurred.

335. Mr. Murphy stated that he personally "did not witness any abuse" on the video surveillance.

336. Ms. Watson responded to Mr. Murphy that, "if neither one of us saw abuse, and if the other two paraeducators who were assisting the student that day were not being investigated, then I should not be reported."

337. Mr. Murphy did not have a substantive answer to this very logical observation.

338. Ms. Watson again stood firm to Mr. Murphy that she did not want to quit her current position and wanted to remain working at JCJHS – again her kids were there, she coached the basketball team, and the commute was close, not to mention that she needed and loved her job.

339. In response to Ms. Watson's statement of wanting to remain at JCJHS, Mr. Murphy became firm and gave her two flat options: "willingly resign or be terminated."

340. More importantly, Mr. Murphy then more strongly pushed Ms. Watson to resign and disclosed more terms the school had.

341. Mr. Murphy then added that if Ms. Watson wanted to seek employment elsewhere, she would also "need to agree" that "no party is liable."

342. Mr. Murphy also then added that Ms. Watson needed to agree to all of the school's terms, including signing a general release *requiring Ms. Watson to give up any and all legal* claims against the school *for harm to **her***.

343. The entire situation from the threats (DCYF) to 'inducements' including a "neutral" letter of recommendation and "not contesting" unemployment made even less sense given that the school wanted her to release it from all claims of liability that *Ms. Watson had against the school.*

344. In other words, Ms. Watson understood the offer from her employer was *that she had to release the school from any claim of wrongdoing against her*, in return for the possibility[4] of unemployment payments and avoiding having false allegations, which were disproved by the video and Mr. Murphy's prior statements, levied against her to DCYF.

345. At that point, Ms. Watson felt that this highest-level union representative was part of the school Defendants' attempt to rid themselves of her and trying to brush the false allegations 'under the rug' and thus, Ms. Watson's trust of Mr. Murphy ran out.

346. Thus, Ms. Watson started to question Mr. Murphy as to why he was not willing to "do more" for her regarding the alleged incident that took place on or around December 5, 2024, where they both agreed – upon seeing the video – that she had done nothing wrong and also because nothing similar had happened to the two other Paras involved in O.M.'s transition that day.

347. Mr. Murphy stated that he "does not agree with JCJHS" and that it "wasn't right at all," but then continued to push Ms. Watson to resign, stating that she would be able to "get a job anywhere."

348. Ms. Watson expressed to him strongly that this situation was "about my reputation," which had already been "tarnished by these false allegations."

349. Ms. Watson expressed to Mr. Murphy the magnitude of harm already done to her by accusing her of alleged abuse, especially being a mother of four children.

350. By that point, only a month after the incident, the false allegations were already known to Ms. Watson's coworkers, neighbors, friends, let alone her kids, in that small town.

351. For example, on or around soon after the alleged incident on December 5, 2024, one of Ms. Watson's children, who was enrolled at JCJHS, heard mentions of her "termination" from

---

[4] An employer not contesting unemployment does not guarantee unemployment awards, especially with a resignation, as this is a matter decided by the state and resignation is often not found to warrant unemployment benefits.

other students and informed Ms. Watson that the false allegations were already well known, right after the alleged incident.

352. The threat of termination and a false report to DCYF was distressing, but even more distressing was the damage to Ms. Watson's reputation — which had already occurred and *grew over time, and continues to grow as of the date of this filing* given the small town Ms. Watson lives and worked in.

353. Ms. Watson had became fearful of seeing people she had known for years in public due to the false allegations harming her reputation.

354. Ms. Watson raised all of these concerns with Mr. Murphy who just kept urging her to take the school's 'deal.'

355. Ms. Watson then raised to Mr. Murphy how the December 5, 2025, allegations occurred literally weeks after returning from FMLA, requesting to have a private place and time to pump (which was not provided until Ms. Watson pushed), complaining about not having a private place to pump, then being walked in on half-naked twice by two different men – including her accuser Mr. Silveira – and formally reporting both incidents of sexual harassment to Mr. Silveira himself, and to the Vice Principal Mr. Kelley.

356. Moreover, Ms. Watson raised to Mr. Murphy the differential treatment between herself and a male educator who had – months early in or around October of 2024 – been accused of assault, but did not have a video to exonerate him, and he was still out on leave and *not* fired – or threatened – upon information and belief.

357. In fact, in the above incident, the male educator had been *actually* reported to DCYF by the parents, yet none of what was happening to Ms. Watson occurred to this similarly-situated male educator.

358.   Ms. Watson raised all of this to Union President Mr. Murphy and his response was to just push her to take the school's offer or said nothing.

359.   Ms. Watson ended the conversation with Mr. Murphy confused, feeling persecuted for no reason, and highly distressed.

360.   The next day, on or about January 3, 2025, Ms. Watson received an email from Mr. Scanlon, forwarded by Frank Murphy, Union President.

361.   The email was originally sent by Mr. Scanlon to Mr. Murphy and Superintendent Mr. Holcomb originally, then forwarded by Mr. Murphy to Ms. Watson.

362.   The email states that "in consultation with Superintendent Holcomb" that the email "would like to propose the following agreement" that was "conditional upon Amber Watson's voluntary resignation" and proceeds to provide the "key terms."

363.   The first "key term" was the voluntary resignation and most of the remaining six "key terms" were obligations of Ms. Watson or threats, effectively.

364.   Among the threats were that Defendant would "not contest" the unemployment benefits, versus fight her unemployment; however, by its own language, that key term recognized that it is the state that decides if unemployment is awarded, not Defendants.

365.   The other threat was titled "Reporting" and stated, "the district will not make *additional reports* to state agencies regarding the employee.."

366.   The words "additional reports" was confusing as Ms. Watson was never contacted by any state agency, or notified of the involvement of any state agency or informed of any reports about her to start with.

367.   The remaining terms – in return for the school *not reporting false allegations to the state* and "not contesting" (versus fighting) unemployment – required Ms. Watson to not just voluntarily resign but to sign a "Nondisclosure" Agreement ("NDA"), to accept "No

Admission of Wrongdoing [by the school]," and required Ms. Watson to sign a "General Release" which, by its very terms, would release the school from *all legal claims* **Ms. Watson had against the school**.

368. The one "inducement" other than not contesting unemployment and not making false allegations, in return for Defendants obtaining Ms. Watson's consent to sign a NDA, agree the school had no liability as to her, and for Ms. Watson to waive all legal claims *she has* against the school, was a "neutral letter of recommendation."

369. Ms. Watson was shocked by the offensive letter and that her Union, and its president Mr. Murphy, would even present this to her.

370. The letter ended by claiming that the "proposed agreement aims to address the situation in a professional and equitable manner for all parties involved."

371. However, that offer had no equity for Ms. Watson.

372. The letter required a response only days later, by January 7, 2025.

373. On or around January 6, 2025, Mr. Murphy called Ms. Watson to again try to push Ms. Watson to accept the proposal the administration was offering her.

374. Mr. Murphy then added his *own* threats.

375. Despite him admitting she did nothing wrong, Mr. Murphy threatened that "he feels the union would not be willing to cover any attorney fees if [she] decided to take legal action" which Ms. Watson took as the union saying, through its president, that it refused to perform its obligations to protect her from her employer.

376. Additionally, during this conversation Mr. Murphy also threatened her in another way; he stated that if Ms. Watson told him that she "wanted them to terminate [her], the checks would stop right away."

377.  Ms. Watson then responded to Mr. Murphy that "the checks were going to stop whether [she] was terminated or resigned."

378.  Mr. Murphy then asked Ms. Watson what her response would be regarding the proposal the Defendants were offering her.

379.  Ms. Watson told Mr. Murphy she would not sign a non-disclosure agreement, say her employer had no liability, or waive all claims – and she did not want to quit.

380.  Ms. Watson believed that wrong had been done by the Defendants to her, and that her reputation had been badly tarnished in the small town she had been in her whole life and that her reputation "was more important than anything else."

381.  On January 7, 2025, Ms. Watson emailed Mr. Scanlon, Mr. Silveira, and Mr. Murphy, thus also noticing the school district and Superintendent Mr. Holcomb, that she refused to resign.

382.  Moreover, this email registered a series of detailed complaints about the aforesaid events regarding FMLA retaliation, sex discrimination, sexual harassment, failure to provide time and space to express breast milk, and retaliation – complaints previously made verbally and were not addressed.

383.  In that email, Ms. Watson raised concerns again about how no wrongdoing was done on her part and that she was only performing a normal function of the job.

384.  Ms. Watson also pointed out in her formal complaint email how out of three paraeducators aiding in the assistance of a student, she was "the only one sent home on paid administrative leave for an 'investigation.'"

385.  Further in this email, Ms. Watson stated that the alleged incident which resulted in the "investigation" was only "three weeks after her return from FMLA where [she] was not debriefed on any change in policy or procedure, nor was [she] given an assigned role and a schedule."

386. Specifically in this email, Ms. Watson noted that, "I'm very aware that had there been any signs of abuse any and all parties would have had to report any questionable behavior immediately."

387. Ms. Watson also stated in this formal complaint email that it had "been made clear to me that nothing has been reported" as there was "absolutely no signs of abuse in that video."

388. In this email, Ms. Watson also reported the differential treatment as to the male co-worker in the same building who was accused of assaulting a child, and he was on paid administrative leave but was not, upon information and belief, being threatened with reports to DCYF by the school, or threatened with termination if he did not resign.

389. Notably, this teacher was reported to DCYF by the child's parents, which is completely different than Ms. Watson's situation.

390. Ms. Watson further pointed out that in that male teacher's case, there is "no video evidence to exonerate him unlike myself."

391. In this January 7, 2025, email where Ms. Watson was re-reporting her prior verbal complaints about her treatment, she expressed concerns about the timing of the sudden false allegations (where she was the only one of three Paras targeted for termination).

392. Specifically, Ms. Watson complained that she had just come back from FMLA/maternity leave and was not provided time or space to pump; she further complained that in a short time she had been walked in on while pumping twice — by two different men including Principal Silveira, who initially levied the false claims of abuse against Ms. Watson.

393. On or around January 7, 2025, Ms. Watson received an email from Mr. Scanlon.

394. Mr. Scanlon informed Ms. Watson that he had received her response and had thus shared it with the Superintendent, Mr. Holcomb, and that he would be addressing this matter moving forward.

395. Upon any report (including the prior verbal reports) under school policy, the school administration and HR have a duty to investigate and remedy any discrimination or retaliation with swift remedial measures.

396. Thus, certainly upon a formal written report on January 7, 2025, along with Mr. Scanlon's statement that he would be addressing the matter, the Defendants had a duty to investigate the matter and take swift remedial action – and certainly *not* to retaliate against Ms. Watson, such as by terminating or suspending her.

397. Despite this duty, following Ms. Watson's complaints of discrimination, retaliation, and failure to accommodate, on or around January 7, 2025, she was just left out on administrative leave with no communication whatsoever – for *months more*.

398. Importantly, despite Ms. Watson having made protected reports of discrimination and retaliation, as well as failure to accommodate lactation, she never heard back from the school about any investigation into her reports.

399. More specifically, Ms. Watson did not hear from the school, Mr. Holcomb, or the Union President Mr. Murphy *until she filed her charge of discrimination* with the Massachusetts Commission Against Discrimination (MCAD) which was five (5) months after these events.

400. Filing a complaint with the MCAD is a protected act under state law 151B and Federal laws applicable to the claims in this complaint.

401. Yet, following filing with the MCAD and nearly five (5) months later after the events, on or about May 5, 2025, Plaintiff received Defendants' April 30, 2025 letter from Superintendent Mr. Holcomb, titled "notice of intent to suspend or terminate employment."

402. After the protect acts of the January 7, 2025, formal complaint and re-report of discrimination, retaliation, and failure to accommodate, and the filing with the MCAD, Plaintiff was protected from retaliation.

403. Despite that, a "notice of intent to suspend or terminate employment" is retaliatory action that is unlawful under several laws implicated in this complaint.

404. The aforesaid is especially true given the investigation into the "allegations" against Ms. Watson were long since resolved months ago.

405. The aforesaid is especially true given there was no discernable investigation into Ms. Watson's formal complaints – despite months of time to do so.

406. Moreover, by the time the letter reached Ms. Watson on or about May 5, 2025, she had days to find a lawyer and had no trusted union representative to attend the required hearing with on the dictated date of May 9, 2025.

407. Given past dealings with Mr. Murphy, and the fact that he was the *President* of the whole union in that district, Ms. Watson did not feel the union was protecting her at all and in fact, was working against her interest and adding to her reputational harm and damages.

408. At that point, Ms. Watson had no choice but to resign.

409. In fact, any reasonable person in her situation, having been left out of work for half a year with no communication, false allegations, and threats if claims against the school were not waived and NDA signed along with her resignation and acceptance of the school having no liability for what it did to her - who also formally reported unlawful discrimination, retaliation, and failure to accommodate with no investigation – that now faced what would undoubtedly be a biased hearing, would feel they had no choice but to resign.

410. Thus, Ms. Watson was constructively discharged through a May 8, 2025, letter.

411. Alternatively, this May 8, 2025, letter explained that much prior to that time, Ms. Watson believed she was already effectively terminated as she was left out on administrative leave for five (5) months when the "investigation" had long since concluded, with no communication.

412. The intent to terminate or suspend letter and the hearing were just an act of the Defendants attempting to cover what had already been a termination just not made formal.

413. Since that time in May of 2025, Ms. Watson has faced tremendous humiliation and anxiety in public on numerous occasions due to the false allegations or due to having to explain to parents that she no longer worked there (and get deal with the question of "why"), as well as not be able to attend her children's school events.

414. For example, in or around November of 2025, Ms. Watson could not go into her daughter's basketball tryouts due to anxiety; she sat outside of the Junior High and waited for her daughter to come out from basketball tryouts.

415. Ms. Watson was too anxious to go inside, so she just waited in her car hoping her daughter was doing great.

416. This type of anxiety related to her children's school (and her former employer) have gone on for months and will continue until she is exonerated.

417. As another example of the humiliation these events have caused is that, due to the allegations of child abuse, Ms. Watson stopped helping with girl scout meetings since they took place at the school.

418. Ms. Watson's doctors, due to these events, have had to prescribe her antidepressants and drugs to sleep, even while she was breastfeeding (and now additional pregnancy), due to her anxiety and humiliation in public.

419. The humiliation of Ms. Watson continued into the 2025-2026 school year due to blatant errors by Defendants.

420. Specifically, Ms. Watson was contacted by her daughter's peers at the end of the summer as they were excited to see Ms. Watson was assigned as the teaching assistant to their classrooms.

421. Ms. Watson had to tell these children that "it must be a mistake" and that she was not in their classroom.

422. Then Ms. Watson was sent a picture where Ms. Watson saw she was on the upcoming school schedule, and thus, Ms. Watson has proof of Defendants' further acts which humiliated Plaintiff and caused her great anxiety.

423. Ms. Watson then reached out to a friend / former colleague who is in charge of assigning classrooms for the following year at the junior high and she was completely unaware that Ms. Watson was not returning and thus, she had assigned Ms. Watson to several classrooms and gave her a full schedule.

424. That schedule went out to many students and parents including those with an IEP that Ms. Watson had worked with and their parents.

425. The following week there was an open house that Ms. Watson had to overcome her anxiety and attend for her children.

426. However, the humiliation continued.

427. During the open house, several parents approached Ms. Watson enthusiastically that they had seen she was assigned to their child's classrooms and Ms. Watson had to inform them that she was not working in Swansea this upcoming year.

428. It was extremely distressing for Ms. Watson to face both people who knew about the allegations as well as those who either did not know about the allegations, or did not believe them, that were asking about Ms. Watson being assigned to their (or their kids) classrooms – where Ms. Watson had to explain she was not returning.

429. Adding to the humiliation and feeling of discrimination and retaliation, soon after the open house, while at her son's varsity football game for Swansea public schools Ms. Watson was

approached by Grant Hajder who was her colleague that was out on paid administrative leave

for allegations of abuse (without a video to exonerate him).

430. Ms. Watson spoke to Grant Hajder, who confirmed that – as differential treatment and more

evidence of pretext – that he was not pushed to resign or threatened to be terminated if he did

not resign, sign an NDA, admit the school had no liability, and sign a general waiver releasing

all claims against the school.

431. Instead, at this football game, Grant Hajder told Plaintiff he got his "life back" and returned to

school beginning of the school year and that he had returned back to work full time with his

old regular schedule.

432. Plaintiff specifically asked Grant Hajder if the union president ever asked if he resign and he

said absolutely not or ever suggested he seek employment elsewhere.

433. Further, Ms. Watson feels the school is retaliating against her children in its school district

and think, upon complaint, not properly addressing the issues, punishing her children.

434. Ms. Watson's children are being targeted, and/or their issues ignored; for example, Plaintiff's

6th grade son with special needs, who has an IEP, was punished due to his disabilities.

435. Worse, Ms. Watson's son was threatened with detention for unjust reasons.

436. When Ms. Watson complained to the Assistant Principal Mr. Kelly, she received no response

from Mr. Kelly.

437. Instead of a response from the Assistant Principal, Plaintiff only heard from the Math teacher

who had disciplined Plaintiff's young son; in this communication, this teacher admitted that

he had not even read the child's IEP.

438. Plaintiff's young son was traumatized when he came home and had no idea why he was in

trouble and was just begging Ms. Watson to sign the sheet so he did not have detention.

439. Notably, Plaintiff's 6th grade son asked if he "was being punished because of [Ms. Watson] and that [she] used to work" there.

440. Plaintiff continues to be anxious to deal with her children's school (and former employer) and continues to suffer public humiliation in her town and when forced to go to her children's school, due to the false allegations.

441. Ms. Watson is fearful of going in public and can barely go into her own children's school due to anxiety.

442. Further, there are others that do not know Ms. Watson well, in the community, that Ms. Watson can tell know about the allegations about her, which makes her uncomfortable to be in public.

443. In short, Ms. Watson has faced enormous and ongoing financial stress, having had difficulty finding a job and when she did, she had to find a job in a district that was a significant commute and where Ms. Watson had to be walked out by a security guard, making her not feel safe especially after becoming pregnant again, fearing what would come based on past experiences, and reliving being walked in on by two men.

444. Ms. Watson had to take the job at a new school, not near her town, because she figured no one would be aware of the false allegations.

445. Specifically as to the increased anxiety her new pregnancy caused at her new job, during her tenure in her new job, which was uncomfortable enough due to fear of allegations coming out and having a lack of safety at work, Plaintiff found out that she was pregnant again; the idea of dealing with pumping in a new school created extreme anxiety, and continues to.

446. Plaintiff feels like she is constantly reliving being walked in on at Swansea.

447. Due to the prior trauma, the stated ongoing stress of having to go through the pumping and FMLA issues she had with Defendants, as well as the comparative lack of organization and

safety in the new job and long commute, in December of 2025, Ms. Watson could not continue that job with the support of her treatment providers.

448.  Thus, Ms. Watson has lost substantial income and other benefits.

449.  Moreover, the emotional distress has been extreme and is ongoing due to all of the above.

450.  In fact, as noted, Ms. Watson has been on medication and has been in therapy due to these events caused by Defendants.

451.  As a direct and proximate result of her employer's actions and omissions, Ms. Watson suffered loss of income, loss of earning potential, loss of benefits and other economic harm; experienced humiliation and loss of standing in the community as well as *substantial* harm to her reputation; and suffered and continues to suffer from emotional distress and mental anguish. All damage continues to date.


## COUNT ONE
## VIOLATION OF FMLA - RETALIATION
*Violation of the Family and Medical Leave Act 29 U.S.C. § 2615 (FMLA) and the Massachusetts Family and Medical Leave Act (FMLA)*
**As to Defendants:**
**Swansea School District, Swansea School Committee, City of Swansea, JCJHS Principal Robert Silveira, Mr. Sean Scanlon, School District Director of Student Services, Superintendent Mr. Scott Holcomb**

452.  Paragraphs 1 – 451 are hereby incorporated by reference in their entirety as if fully stated herein.

453.  Plaintiff was protected from retaliation for exercising her rights under FMLA and the state analog.

454.  One of those protections was from interference with her FMLA.

455.  Yet, Plaintiff was contacted and urged to return from FMLA early.

456.  That constitutes FMLA interference.

457.  Further, Defendants also committed FMLA retaliation.

458. Plaintiff's job was protected and upon her return to work after FMLA, she was entitled to the same or substantially similar job as well.

459. Plaintiff was retaliated against for exercising her rights to take protected leave, as described above, including but not exclusive to changing Plaintiff's schedule to that of a floater.

460. Further, as to retaliation, Defendants made her work intolerable with difficulties regarding getting an accommodation to express milk and then the false allegations about Plaintiff being abusive towards a student less than a month after returning from FMLA.

461. Defendants otherwise violated *inter alia*, FMLA and the state analog, by not offering Plaintiff the same or a substantially similar job to return to.

462. Defendants otherwise retaliated *inter alia*, FMLA and the state analog, by retaliating against Plaintiff for her FMLA leave by the acts and omissions alleged above.

463. Defendants' and its agents' aforesaid conduct retaliating against Plaintiff for exercising her rights was willful conduct and/or conduct in reckless disregard of whether the conduct was prohibited.

464. Plaintiff was damaged as a direct and proximate result of Defendants' and its agents' intentional conduct in the ways aforesaid.

465. Because Defendants' conduct was intentional, constitutes gross negligence, recklessness, and was willful and/or wanton, punitive or exemplary damages are warranted.

466. Defendants is responsible for its agents' acts and omissions under the theory of *Respondeat superior*.

**COUNT TWO**
**42 U.S.C. § 1983 CONSTITUTIONAL VIOLATIONS – SUBSTANTIVE DUE PROCESS FOR LIBERTY INTEREST**
*United States Constitution Substantive Due Process – Liberty Interest and Right to Reputation under the Fifth and Fourteenth Amendment, 42 U.S.C. § 1983, and Commonwealth of Massachusetts Constitution*
**As to Defendants:**
***Swansea School District, Swansea School Committee, City of Swansea, JCJHS Principal Robert Silveira, Mr. Sean Scanlon, School District Director of Student Services, Superintendent Mr. Scott Holcomb, Swansea Massachusetts Teachers' Union, and Frank Murphy Union President***

467.  Paragraphs 1 – 451 are hereby incorporated by reference in their entirety as if fully stated herein.

468.  Plaintiff has a fundamental right to, and liberty interest in, her reputation and the right to be free from government interference in the same.

469.  The Fifth and Fourteenth Amendment of the United States Constitution, Civil Rights Act of 1871, 42 U.S.C. § 1983, and the Commonwealth of Massachusetts Constitution provide that no person shall be deprived of liberty or property without due process of law.

470.  The aforesaid Constitutional provisions protect individuals from deprivations of rights protected by the Constitutions of the United States and Massachusetts, committed by state actors persons acting under the color of state authority.

471.  Defendants made numerous false statements about Plaintiff and her job competence, made false accusations about Plaintiff's treatment of a child, published statements about the same, threatened to report Plaintiff to DCYF if she did not quit, sign a NDA, admit the school had no liability, and sign a general release.

472.  The false statements placed Plaintiff's reputation in an unfavorable light.

473.  Plaintiff was deprived of her liberty interest in her reputation because of Defendants' actions and omissions.

474.  Therefore, Defendants deprived Plaintiff of a substantive liberty interest without due process of law, in violation of the right guaranteed by the Fifth and Fourteenth Amendment to the United

States Constitution, actionable under 42 U.S.C. § 1983, and in violation of rights guaranteed under the Commonwealth of Massachusetts Constitutions.

475.   Defendants are state actors at all times relevant.

476.   Defendants were acting under the color of state authority at all times relevant.

477.   The statements about Plaintiff were levied without care or deliberation.

478.    Defendants' agents' actions that resulted in deprivations were acts that shock the conscience.

479.   Plaintiffs seek redress for violations constitutionally protected interests and rights committed by Defendants while acting under the color of state law.

480.   Defendants' agents' actions were intentional and/or reckless; they were taken for the purpose of causing a deprivation of Plaintiff's stated liberty interest secured by the United State and Massachusetts Constitutions and in reckless disregard of Plaintiff's substantive due process rights.

481.   Plaintiff experienced the damages aforesaid as a proximate result of Defendants' agents' intentional conduct.

482.   Because Defendants' conduct was intentional, willful and/or wanton, punitive or exemplary damages are warranted.

483.   Defendants are liable for the actions of their agents, employees, and officers and under *Respondeat Superior*.

**COUNT THREE**
*GENDER/SEX AND PREGNANCY-RELATED MEDICAL CONDITION HARASSMENT /*
*DISCRIMINATION – DISCRIMINATORY TERMS AND CONDITIONS*
*GENDER/SEX AND PREGNANCY-RELATED MEDICAL CONDITION HARASSMENT /*
*DISCRIMINATION - DISCRIMINATORY CONSTRUCTIVE DISCHARGE*
***Violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2 ("Title VII"), The***
***Pregnancy Discrimination Act of 1978, codified in 42 USC § 2000e (k) ("PDA")***
***Violation of Mass. General Laws c.151B § 4 ("151B")***
**As to Defendants:**
***Swansea School District, Swansea School Committee, City of Swansea <u>only</u>***

484. Paragraphs 1 – 451 are hereby incorporated by reference in their entirety as if fully stated herein.

485. Plaintiff is afforded protections from sexual and gender-related harassment and discrimination, and thereby her sex, under Title VII, the PDA, and M.G.L. c.151B.

486. Defendant subjected Plaintiff to severe and pervasive sexual harassment and disparate treatment, as well as an unresolved hostile work environment, which altered the terms and conditions of her employment.

487. Defendant knew of the harassing and discriminatory conduct but failed to take swift or remedial action in violation of, inter alia, Title VII, the PDA, and M.G.L. c.151B.

488. Defendants' agents created such a hostile work environment that no reasonable person could have remained in that job; as a result, Plaintiff was constructively discharged due to Defendants' discrimination.

489. Defendant constructively discharged Plaintiff because of her gender/sex.

490. Alternately, Defendants effectively terminated Plaintiff as alleged above well before her forced constructive discharge.

491. But for Defendants' discriminatory conduct, Plaintiff would not have been constructively discharged.

492. Plaintiff experienced the aforesaid and incorporated damages as a direct and proximate result of Defendants' intentional, unlawful conduct.

493. Defendants' discriminatory conduct, policies, and practices were intentionally discriminatory, motivated by animus, impermissible, and unlawful considerations and violate, inter alia, Title VII , the PDA, and M.G.L. c.151B.

494. Because Defendants' conduct was intentional, constituted gross negligence, recklessness, and was willful and/or wanton, punitive or exemplary damages are warranted.

495. Plaintiff experienced the damages aforesaid as a proximate result of Defendants' agents' intentional conduct.

496. Defendants are vicariously responsible for the acts and omissions of its agents under the doctrine of respondeat superior.

**COUNT FOUR**
*GENDER/SEX AND PREGNANCY-RELATED MEDICAL CONDITION HARASSMENT /*
*DISCRIMINATION – DISCRIMINATORY TERMS AND CONDITIONS*
*GENDER/SEX AND PREGNANCY-RELATED MEDICAL CONDITION HARASSMENT*
*DISCRIMINATION - DISCRIMINATORY TERMINATION*
***Violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2 ("Title VII"), The***
***Pregnancy Discrimination Act of 1978, codified in 42 USC § 2000e (k) ("PDA"),***
***Violation of Mass. General Laws c.151B § 4 ("151B")***
***As to Defendants:***
***Swansea School District, Swansea School Committee, City of Swansea only***

497. Paragraphs 1 – 451 are hereby incorporated by reference in their entirety as if fully stated herein.

498. Plaintiff is afforded protections from sexual and gender-related harassment and discrimination, and thereby her sex, under Title VII, the PDA and M.G.L. c.151B.

499. Defendant subjected Plaintiff to severe and pervasive sexual harassment and disparate treatment, as well as an unresolved hostile work environment, which altered the terms and conditions of her employment.

500. Defendant knew of the harassing and discriminatory conduct but failed to take swift or remedial action in violation of, inter alia, Title VII, the PDA, and M.G.L. c.151B.

501. Defendant left Plaintiff out on administrative leave and Defendant, as well as the union, pushed Plaintiff to resign or she would be reported to DCYF and not have her unemployment supported by Defendant.

502. Effectively, Plaintiff was terminated because of her gender/sex and/or pregnancy-related medical condition.

503. But for Defendants' discriminatory conduct, Plaintiff would not have been terminated.

504. Plaintiff experienced the aforesaid and incorporated damages as a direct and proximate result of Defendants' intentional, unlawful conduct.

505. Defendants' discriminatory conduct, policies, and practices were intentionally discriminatory, motivated by animus, impermissible, and unlawful considerations and violate, inter alia, Title VII, the PDA, and M.G.L. c.151B.

506. Because Defendants' conduct was intentional, constituted gross negligence, recklessness, and was willful and/or wanton, punitive or exemplary damages are warranted.

507. Plaintiff experienced the damages aforesaid as a proximate result of Defendants' agents' intentional conduct.

508. Defendant Swansea Public Schools is vicariously responsible for the acts and omissions of its agents under the doctrine of respondeat superior.

**COUNT FIVE**
*GENDER/SEX AND PREGNANCY-RELATED MEDICAL CONDITION HARASSMENT /*
*RETALIATION – RETALIATORY TERMS AND CONDITIONS*
*GENDER/SEX AND PREGNANCY-RELATED MEDICAL CONDITION HARASSMENT /*
*RETALIATION - RETALIATORY CONSTRUCTIVE DISCHARGE*
***Violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-3, The Pregnancy***
***Discrimination Act of 1978, codified in 42 USC § 2000e (k) ("PDA"),***
***Violation of Mass. General Laws c.151B § 4 ("151B § 4")***
**As to Defendants:**
***Swansea School District, Swansea School Committee, City of Swansea <u>only</u>***

509. Paragraphs 1 – 451 are hereby incorporated by reference in their entirety as if fully stated herein.

510. Plaintiff was protected from retaliatory harassment, discrimination, and termination as a result of engaging in protected conduct under Title VII, the PDA, and M.G.L. c.151B.

511. Plaintiff engaged in protected conduct, opposed unlawful conduct, and exercised her rights under Title VII, the PDA, and M.G.L. c.151B.

512. Specifically, Plaintiff reported sexually harassing comments, gender-based discrimination, sexual harassment by men walking in while she was pumping, and the failure to accommodate

her lactation-related needs to leadership, all of which are protected under Title VII, the PDA, and M.G.L. c.151B.

513. As a result of Plaintiff's protected activity, and specifically because of retaliation for her reports of her gender/sex and/or pregnancy-related medical condition, Plaintiff was subjected to retaliatory treatment by Defendants' agents, including adverse changes to the terms and conditions of her employment.

514. Additionally, as a result of Plaintiff's protected activity, Defendants' agents created such a hostile work environment that no reasonable person could have remained in that job; as a result, Plaintiff was constructively discharged due to Defendants' retaliation.

515. But for Defendants' retaliatory conduct, Plaintiff would not have been constructively discharged.

516. Defendants' retaliatory conduct, policies, and practices were intentionally retaliatory, motivated by animus, impermissible, and unlawful considerations and violate, inter alia, Title VII, the PDA, and M.G.L. c.151B.

517. Because Defendants' conduct was intentional, constituted gross negligence, recklessness, and was willful and/or wanton, punitive or exemplary damages are warranted.

518. Plaintiff experienced the damages aforesaid as a proximate result of Defendants' agents' intentional conduct.

519. Defendant Swansea Public Schools is vicariously responsible for the acts and omissions of its agents under the doctrine of respondeat superior.

**COUNT SIX**
*GENDER/SEX AND PREGNANCY-RELATED MEDICAL CONDITION HARASSMENT /*
*RETALIATION – RETALIATORY TERMS AND CONDITIONS*
*GENDER/SEX AND PREGNANCY-RELATED MEDICAL CONDITION HARASSMENT /*
*RETALIATION - RETALIATORY TERMINATION*
**Violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-3, The Pregnancy**
**Discrimination Act of 1978, codified in 42 USC § 2000e (k) ("PDA"),**
**Violation of Mass. General Laws c.151B § 4 ("151B § 4")**
**As to Defendants:**
**Swansea School District, Swansea School Committee, City of Swansea <u>only</u>**

520. Paragraphs 1 – 451 are hereby incorporated by reference in their entirety as if fully stated herein.

521. Plaintiff was protected from retaliatory harassment, discrimination, and termination as a result of engaging in protected conduct under Title VII, the PDA, and M.G.L. c.151B.

522. Plaintiff engaged in protected conduct, opposed unlawful conduct, and exercised her rights under Title VII, the PDA, and M.G.L. c.151B.

523. Specifically, Plaintiff reported sexually harassing comments, gender-based discrimination, sexual harassment by men walking in while she was pumping, and the failure to accommodate her lactation-related needs to leadership, all of which are protected under Title VII, the PDA, and M.G.L. c.151B.

524. As a result of Plaintiff's protected activity, Plaintiff was subjected to retaliatory treatment by Defendants' agents, including adverse changes to the terms and conditions of her employment.

525. Additionally, as a result of Plaintiff's protected activity, Defendants' agents created a hostile work environment.

526. Defendant left Plaintiff out on administrative leave and Defendant, as well as the union, pushed Plaintiff to resign or she would be reported to DCYF and not have her unemployment supported by Defendant.

527. Effectively, Plaintiff was terminated because of retaliation for her reports of her gender/sex and/or pregnancy-related medical condition.

528. But for Defendants' discriminatory conduct, Plaintiff would not terminated.

529. Defendants' retaliatory conduct, policies, and practices were intentionally retaliatory, motivated by animus, impermissible, and unlawful considerations and violate, inter alia, Title VII, the PDA, and M.G.L. c.151B.

530. Because Defendants' conduct was intentional, constituted gross negligence, recklessness, and was willful and/or wanton, punitive or exemplary damages are warranted.

531. Plaintiff experienced the damages aforesaid as a proximate result of Defendants' agents' intentional conduct.

532. Defendant Swansea Public Schools is vicariously responsible for the acts and omissions of its agents under the doctrine of respondeat superior.

**COUNT SEVEN**
*PREGNANCY-RELATED MEDICAL CONDITION DISCRIMINATION – FAILURE TO*
*ACCOMMODATE PREGNANCY-RELATED MEDICAL CONDITION*
*Violation of Mass. General Laws c.151B § 4 ("151B § 4)*
**As to Defendants:**
***Swansea School District, Swansea School Committee, City of Swansea* <u>*only*</u>**

533. Paragraphs 1 – 451 are hereby incorporated by reference in their entirety as if fully stated herein.

534. Massachusetts General Laws c.151B § 4 mandates that employers provide reasonable accommodations for lactation or the need to express breast milk for a nursing child, including more frequent or longer paid or unpaid breaks and private non-bathroom space for expressing breast milk.

535. Plaintiff therefore, was entitled to a private, sanitary space to pump, as well as allowed to have the time to express breast milk, even if this takes longer than the typical break, pursuant to Mass. Gen. Laws c.151B § 4.

536. Defendant failed to provide reasonable accommodations for Plaintiff's pregnancy-related medical condition, in violation of Mass. Gen. Laws c.151B § 4(a), which makes it an unlawful

practice for an employer to deny a reasonable accommodation for an employee's pregnancy or a condition related to pregnancy, including but not limited to lactation or the need to express breast milk for a nursing child, unless the employer can demonstrate undue hardship.

537. Reasonable accommodations under § 4 include, but are not limited to, more frequent or longer breaks, a modified work schedule, private non-bathroom space for expressing breast milk, and job restructuring.

538. Defendant failed to provide Plaintiff with such reasonable accommodations.

539. In fact, both the principal and another man walked in on Plaintiff while she was expressing milk, and lingered in a sexually harassing manner.

540. Defendant knew of Plaintiff's need for accommodation but failed to take swift, remedial action, and failed any 'interactive' process to plan the accommodations, instead permitting and perpetuating discriminatory treatment against Plaintiff.

541. Defendants' discriminatory conduct, policies, and practices were intentionally discriminatory, motivated by animus, impermissible, and unlawful considerations, and in direct violation of Mass. Gen. Laws c.151B § 4.

542. Plaintiff experienced the damages aforesaid as a direct proximate result of Defendants' agents' intentional conduct.

543. Because Defendants' conduct was intentional, constitutes gross negligence, recklessness, and was willful and/or wanton, punitive or exemplary damages are warranted.

544. Defendant is vicariously responsible for the acts and omissions of its agents under the doctrine of respondeat superior.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays that this Court:

a.    Order judgment for Plaintiff against Defendant on all Counts of the Complaint and declare that the practices detailed in this Complaint are unlawful;

b.    Order, for all applicable Counts, that Defendant make Plaintiff whole by awarding appropriate back pay with interest, front pay, compensation for all other lost income and benefits, earning capacity, and all other relevant entitlements and emoluments;

c.    Order, for all applicable Counts, that Plaintiff be awarded an amount of money which will fairly compensate her for her mental anguish, emotional pain and suffering, damage to his reputation, loss of standing in the community, and other damages incurred;

d.    Order, for all applicable Counts, that Plaintiff be awarded an amount of money which will fairly compensate her for her medical costs and related damages incurred;

e.    Order, for all applicable Counts, that the Defendant pay Plaintiff's costs and reasonable attorney's fees resulting from this action;

f.    Order, for all applicable Counts, that the Defendant pay punitive or exemplary damages, as appropriate to punish Defendant for its malicious conduct, reckless conduct, and/or callous indifference to the statutorily and common law protected rights of Plaintiff;

g.    Order, for all applicable Counts, that Defendant pay pre-judgement, including interest for all damages awarded to Plaintiff from the date the cause of action accrued, and post-judgment interest where appropriate and allowable by law;

h.    Retain jurisdiction of this action to ensure full compliance; and

i.    Order, for all Counts, such other relief to Plaintiff as this Court deems just and proper.

## DEMAND FOR JURY TRIAL

### *PLAINTIFF DEMANDS A TRIAL BY JURY ON ALL ISSUES SO TRIABLE*

January 5, 2026

Respectfully Submitted by Plaintiff,
PLAINTIFF AMBER LIENCZEWSKI,
By her attorney,

 /s/ Paige Munro-Delotto
Paige Munro-Delotto, Ph.D., Esq.
BBO# 690605
Munro-Delotto Law, LLC
400 Westminster Street, Suite 200
Providence, RI 02903
(401) 521-4529
(401) 264-8035 (fax)
Email: Paige@pmdlawoffices.com