## UNITED STATES DISTRICT COURT FOR
## THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| **AMBER LIENCZEWSKI[1]**, | CA No.: 1:26-cv-10018-ADB |
| *Plaintiff,* | **PLAINTIFF DEMANDS TRIAL BY JURY** |
| **vs.** | |
| **SWANSEA PUBLIC SCHOOLS, by and through its superintendent, Scott Holcomb in his official capacity, SWANSEA SCHOOL COMMITTEE by and through Chairperson, Sonya Barbosa in her official capacity only, TOWN OF SWANSEA by and through the board of selectmen, Steven H. Kitchen, Michael Kevin Beaudette, Robert C. Medeiros in their official capacity only, SUPERINTENDENT SCOTT HOLCOMB in his official and individual capacities, DISTRICT DIRECTOR OF STUDENT SERVICES SEAN SCANLON in his official and individual capacities, and PRINCIPAL ROBERT SILVEIRA in his official and individual capacities, SWANSEA EDUCATORS ASSOCIATION, INC., by and through its president Frank Murphy in his official capacity, and FRANK MURPHY UNION PRESIDENT, in his official and individual capacities,** | |
| *Defendants.* | |

## FIRST AMENDED COMPLAINT AND JURY DEMAND

This action is commenced by AMBER LIENCZEWSKI (hereinafter "Plaintiff") against

SWANSEA PUBLIC SCHOOLS, by and through its superintendent, Scott Holcomb in his official

---

[1] Plaintiff legally changed her name from Amber Watson, which the charge of discrimination was listed under, to Amber Lienczewski on or about December 29, 2025; thus, this is her legal name going forward in litigation.

capacity, SWANSEA SCHOOL COMMITTEE by and through Chairperson, Sonya Barbosa in her official capacity only, TOWN OF SWANSEA by and through the board of selectmen, Steven H. Kitchen, Michael Kevin Beaudette, Robert C. Medeiros in their official capacity only, SUPERINTENDENT SCOTT HOLCOMB in his official and individual capacities, DISTRICT DIRECTOR OF STUDENT SERVICES SEAN SCANLON in his official and individual capacities, and PRINCIPAL ROBERT SILVEIRA in his official and individual capacities, SWANSEA EDUCATORS ASSOCIATION, INC., by and through its president Frank Murphy in his official capacity, and FRANK MURPHY UNION PRESIDENT, in his official and individual capacities (hereinafter collectively "Defendants") to remedy and seek relief for unlawful employment practices arising from the Family and Medical Leave Act 29 U.S.C. § 2615 (FMLA) and the Massachusetts Family and Medical Leave Act (FMLA), Pregnancy Discrimination Act 42 U.S.C. § 2000e(k), Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2 and 42 U.S.C. § 2000e-2, § 1983 Violation of Substantive Due Process – Liberty Interest and Violation of Procedural Due Process, violation of the Massachusetts Fair Employment Practices Act, M.G.L. c. 151B, and violation of state law torts of defamation per se, intentional interference with contractual/employment relations, and intentional infliction of emotional distress.

## **PARTIES**

1. Plaintiff Amber Lienczewski ("Plaintiff") presently resides in the City of Swansea, County of Bristol, within the Commonwealth of Massachusetts, and formerly worked for Defendant at Joseph Case Junior High School in Swansea, Massachusetts.

2. Defendant Swansea Public Schools ("Defendant" or "Employer" or "Swansea Public Schools") is, upon information and belief, a public school existing in the municipality of Swansea that employed Plaintiff, being sued by and through Superintendent Scott Holcomb in his official capacity (as well

as individual capacity listed below) and has a principal office located at 1 Gardners Neck Road, in the Town of Swansea, County of Bristol, within the Commonwealth of Massachusetts.

3.  Defendant Swansea School Committee is being sued by and through its Chairperson, Sonya Barbosa in her official capacity only, and is a state actor, at all times relevant acting under color of state, and that upon information and belief, employed Plaintiff; upon information and belief, the School Committee with a principal office located at 1 Gardners Neck Road, in the Town of Swansea, County of Bristol, within the Commonwealth of Massachusetts.

4.  Town of Swansea, is being sued by and through the three board of selectmen listed on the town's website including Steven H. Kitchen, Michael Kevin Beaudette, Robert C. Medeiros, in their official capacity only, and they are all state actors, at all times relevant acting under color of state, that upon information and belief, employed Plaintiff; the City of Swansea's principal place of business is 81 Main Street, Swansea, County of Bristol, within the Commonwealth of Massachusetts.

5.  Mr. Scott Holcomb was at all times relevant the Superintendent of Swansea School District, is a state actor, that at all times was acting under color of state, and is being sued in his official and individual capacities for applicable counts with individual liability and upon information and belief, resides in Massachusetts.

6.  Defendant Robert Silveira was at all times relevant the JCJHS Principal, is a state actor, that at all times was acting under color of state, and is being sued in his official and individual capacities for applicable counts with individual liability and upon information and belief, resides in Massachusetts.

7.  Mr. Sean Scanlon, was at all times relevant the District Director of Student Services for Swansea School District, is a state actor, that at all times was acting under color of state, and is being sued

in his official and individual capacities for applicable counts with individual liability and upon information and belief, resides in Massachusetts.

8.  Swansea Educator's Association, Inc., is being sued by and through its president Frank Murphy in his official capacity.

9.  Frank Murphy, President of the Union at the time of the below events, being sued individually.

10. All of the above defendants are collectively referred to as ("Defendant" or "Employer" or "Swansea Public Schools") as appropriate per count.

## JURISDICTION AND VENUE

11. This Court has jurisdiction to hear the Complaint pursuant to 28 U.S.C. § 1331.

12. This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367. Plaintiff's state claims are so related to Plaintiff's federal claims that they form part of the same case or controversy. Consideration of judicial economy, fairness, and convenience warrants this Court's exercise of supplemental jurisdiction over Plaintiff's state law claims.

13. Venue of this action lies pursuant to 28 U.S.C. § 1391(b) because Defendant conducts business in Massachusetts within the judicial district of this Court, as well as because the alleged unlawful practices occurred and/or continue to occur within the state of Massachusetts within the judicial district of this Court.

## ADMINISTRATIVE PROCEDURES

14. On or about May 5, 2025, Charges of Discrimination were timely filed with the Massachusetts Commission Against Discrimination (MCAD) and co-filed with the Equal Employment Opportunity Commission (EEOC).

15.  On or about October 14, 2025, the MCAD issued its withdrawal of jurisdiction for these claims (MCAD No. 25NEM01414) and the EEOC issued the Right to Sue for the same entities on November 14, 2025 (EEOC No. 16C-2025-01703) enabling this private civil action to be filed.

16.  This Complaint was timely filed after issuance of the withdrawals and Right to Sue notices.

## **FACTUAL ALLEGATIONS**

17. On or around July 2023, Amber Watson was hired by Joseph Case Jr. High School (hereinafter "JCJHS" or "Employer") as a Paraprofessional (hereinafter "Para") staff member.

18. JCJHS is a Public School located in the Swansea District of Massachusetts.

19. JCJHS is located at 195 Main Street Swansea, MA, 02777.

20. As a Para, Ms. Lienczewski was responsible in helping with instruction, behavior-management, and the physical and emotional health of the students, all under the supervision of a certified teacher.

21. At all times relevant, Ms. Lienczewski's supervisors at JCJHS included Robert Silveira, Principal (hereinafter "Mr. Silveira"), and Gregory Kelley, Assistant Principal (hereinafter "Mr. Kelley").

22. At all times relevant since her hiring, Ms. Lienczewski's performance met or exceeded her employer's legitimate expectations

23. In or around December 2023, during her employment, Ms. Lienczewski became pregnant.

24. In or around early 2024, Ms. Lienczewski informed school leadership that she was pregnant and then notified Principal, Mr. Silveira, that she would be on FMLA when school started.

25. As such, upon information and belief, the following two (2) months were scheduled for summer break at JCJHS.

26. In or around September 2024, Ms. Lienczewski began maternity leave.

5

27. In or around September 2024, Ms. Lienczewski started FMLA which consisted of twelve (12) weeks of leave.

28. On or around November 1, 2024, during her maternity and FMLA job-protected leave, when she had two (2) weeks remaining, Ms. Lienczewski received a phone call from Mr. Silveira requesting that she return to work two (2) weeks early on or about November 12, 2024.

29. Ms. Lienczewski agreed to resume work at the earlier date, on or about November 12, 2024, despite still having two (2) weeks remaining FMLA leave available, because Mr. Silveira requested she do so.

30. On or about November 12, 2024, Ms. Lienczewski had a meeting scheduled with Mr. Silveira regarding her schedule upon her return from FMLA leave.

31. Upon information and belief, FMLA requires that an employee return to the same or substantially similar job.

32. Ms. Lienczewski's prior position as a Para involved a set schedule and assignments.

33. However, at this meeting, Ms. Lienczewski was informed by Mr. Silveira that she had not yet been assigned a specific role or schedule.

34. Upon information and belief, Ms. Lienczewski was to be a designated "floater" to fill in where and when she was needed.

35. Importantly, at all times relevant in the past, Ms. Lienczewski had a designated role with assignments, and a set schedule, and was not a "floater."

36. Defendants claimed to the commission that Ms. Lienczewski was not a "floater" but pictures of the schedule provided by Mr. Silveira to Ms. Lienczewski that day, and her later communications with coworkers, make it clear that Ms. Lienczewski was a "floater" rather than having a set schedule.

37. Thus, Defendants violated FMLA by the interference by asking her to return early.

6

38. However, additionally, Defendants retaliated against Ms. Lienczewski by failing to return her to a substantially similar position.

39. Further, later but proximity, Defendants retaliated against Ms. Lienczewski by alleging false allegations and unequal treatment, resulting in her termination/constructive discharge only weeks later.

40. Additionally, during this conversation between Ms. Lienczewski and Mr. Silveira upon her return from FMLA early per his request, Ms. Lienczewski inquired with Mr. Silveira as to a private and clean location to pump her milk, as required by Massachusetts law 151B.

41. Lactation is a pregnancy-related medical condition, and is therefore protected from discrimination by Title VII/the PDA, and 151B.

42. In fact, 151B requires an employer to affirmatively accommodate a lactating person with a private, clean space to pump.

43. More specifically, Ms. Lienczewski asked whether she would be provided a designated private room to pump her milk.

44. During this meeting Mr. Silveira did not identify a location for Ms. Lienczewski to pump; worse, he did not designate time for her to pump.

45. Instead, during this initial meeting with Mr. Silveira on or about November 12, 2024, upon her return from FMLA, Mr. Silveira's new schedule did not designate time to pump.

46. Worse, Mr. Silveira informed Ms. Lienczewski that, "if [she] could find time in [her] schedule to pump twice for 30 minutes each time, [she] should do it" and something to the effect that she "should work it out with the ARCH girls."[2]

---

[2] The "ARCH girls" as Mr. Silveira referred to were a group of women Ms. Lienczewski worked with.

47. In effect, Mr. Silveria told Ms. Lienczewski to work out her own time to pump with her coworkers, versus providing direction *and a location* (as required under 151B).

48. Ms. Lienczewski also felt discriminated against due to the lack of time and space provided to pump.

49. Notably, Ms. Lienczewski was not assigned a room or role, and thus, she had no obvious place to express breast milk.

50. For example, the other teachers had their own classrooms and therefore, should they have needed to express breast milk, they had a designated space where they could pump if they needed to.

51. Ms. Lienczewski understood, from the conversation generally, that she was expected to just "find" a room like she was to "find time in [her] schedule to pump."

52. Ms. Lienczewski had a friend that was out on medical leave that had offered her room.

53. However, her room was not only in the basement which was less sanitary than other locations, but depending where Ms. Lienczewski was in the school, between the walk, setting up the pump, pumping, and returning to duty.

54. Notably, during the meeting with Mr. Silveira a few days prior he had not assigned even the basement room to Ms. Lienczewski; Ms. Lienczewski had to have this conversation herself with her coworker friend.

55. However, depending where she was in the school, the walk to that basement room was long.

56. Only a few days later, on or about November 15, 2024, Ms. Lienczewski was asked by Heather Montigny, JCJHS Secretary (hereinafter "Ms. Montigny"), to cover an 8th grade Science class.

57. Following this 8th grade science class, on or around November 15, 2024, Ms. Lienczewski had a scheduled "prep" period.

58. Notably, Defendants denied to the Commission that paras are asked to cover classrooms.

59. However, once again, Ms. Lienczewski has text evidence demonstrating this is done often at JCJHS.

60. During this "prep" period, Ms. Lienczewski had planned to express her milk with a mechanical breast pump in that room.

61. Again, she had been given no direction – or directives – by Principal Mr. Silveira as to where or when to pump and that she should just 'figure it out.'

62. Ms. Lienczewski considered going to the basement for more security and sanitary reasons, but due to covering for an actual classroom, she felt she did not have time to get all the way to the basement room, pump, and get back in time for the next class.

63. To ensure privacy, Ms. Lienczewski went to talk to a nearby teacher, Ms. Damaris about pumping in that room.

64. Ms. Damaris assured Ms. Lienczewski that "nobody comes up [here]" and thus, she should just "lock the door."

65. Ms. Lienczewski, thus, followed the teacher's suggestions.

66. Ms. Lienczewski locked the door for privacy so that she could use her breast pump machine.

67. Ms. Lienczewski pumped successfully once that morning.

68. Then, later that day, when pumping, suddenly, Ms. Lienczewski noticed the door was being unlocked.

69. Ms. Lienczewski announced loudly that the room was occupied and she was using her breast pump.

70. The principal, Mr. Silveira, proceeded to unlock the door with his master key to the room Ms. Lienczewski was located in, which she had deliberately locked to pump.

71. Mr. Silveira proceeded to enter the room.

72. Ms. Lienczewski's breasts were exposed while she was using her machine, and she was positioned behind a desk.

73. Notably, all lights were on and Ms. Lienczewski was in plain view, as texts with coworkers prove.

74. Despite that Defendants claimed in their commission position paper that the lights were off and Mr. Silveira did not see her, and that once he did, he left right away, which is not true.

75. In fact, despite Ms. Lienczewski announcing herself, sitting there half-naked, Mr. Silveira proceeded to walk around the classroom she was in.

76. Mr. Silveira seemed uncomfortable but yet, would not leave.

77. Mr. Silveira proceeded to try to have a full conversation with Ms. Lienczewski and just kept talking, despite her continued, and increasingly urgent protest, that she was pumping and he needed to leave.

78. Ms. Lienczewski continued to try to get Mr. Silveira's attention to stop walking around the room trying to talk to her but he just kept speaking.

79. Mr. Silveira proceeded towards Ms. Lienczewski, stopping 10 or less feet directly in front of her.

80. Ms. Lienczewski was in complete shock by Mr. Silveira remaining in the classroom.

81. Ms. Lienczewski's breasts were exposed because she was using her pump so she tried to cover up.

82. Ms. Lienczewski continually stated to Mr. Silveira, "I'm using my breast pump."

83. Mr. Silveira finally left.

84. Ms. Lienczewski felt humiliated and uncomfortable that Mr. Silveira had just seen her exposed and pumping.

85. Ms. Lienczewski contemporaneously text her coworkers about Mr. Silveira walking in, stating in pertinent part, "

86. Following Mr. Silveira's extended intrusion while Ms. Lienczewski was pumping, she expressly complained to Mr. Silveira about this event.

87. Ms. Lienczewski complained to Mr. Silveira about his walking in and not having provided a secure and clean place to pump.

88. It was after this complaint that Mr. Silveira assigned Ms. Lienczewski to pump in the basement office of the coworker friend of Ms. Lienczewski's that was on medical leave.

89. In fact, Mr. Silveira not only represented that the room would not be accessible by anyone and he *gave her the key to the room off of his keychain.*

90. Ms. Lienczewski still has this key.

91. Mr. Silveira represented that with that key, *no one* had access to the room as the teacher also did not want anyone in the room except Ms. Lienczewski while she was on leave.

92. Mr. Silveira represented that only he and the custodians had a key to the room and he would advise that this room was off limits.

93. Mr. Silveira represented that this room in the basement was a private space.

94. Despite the room being far away from most locations in the school and in the basement, which was less preferable, Ms. Lienczewski accepted the room.

95. Ms. Lienczewski felt she would finally have a designated room to pump privately.

96. Mr. Silveira represented, as the principal of the school, that Ms. Lienczewski would not be walked in on again while pumping.

97. Mr. Silveira was wrong.

98. Within only days after this conversation, on or about November 21, 2024, while Ms. Lienczewski was expressing milk with her breast pump machine in the designated space that

Mr. Silveira specifically assigned her in the basement which he represented would be private and that no one had a key to except him and the custodians, Mr. John Menke, *not* a custodian, and instead, the Media Center Secretary (hereinafter "Mr. Menke"), abruptly unlocked the door and interrupted Ms. Lienczewski while pumping.

99.  Ms. Lienczewski was baffled and quite distressed, yet again, by being intruded on in a room that was supposed to be secure but for Mr. Silveira and the custodian's keys, and Mr. Silveira's representation that he would ensure it would be private.

100.  As Mr. Menke continued opening the door, Ms. Lienczewski announced her presence.

101.  Ms. Lienczewski explicitly and loudly announced, "[g]et out! I'm using my breast pump!"

102.  Despite this announcement, Mr. Menke proceeded to open the door completely, observing Ms. Lienczewski in a chair located in the corner of the designated room.

103.  Again, as with Mr. Silveira, Ms. Lienczewski's breasts were exposed as Mr. Menke walked in.

104.  After a moment, Mr. Menke closed the door and left.

105.  Ms. Lienczewski was in utter shock.

106.  Unbelievably, then only seconds later, Mr. Menke re-opened the door.

107.  Ms. Lienczewski was in complete and utter disbelief.

108.  Mr. Menke entered the room and lingered for a moment, only a few feet away from where Ms. Lienczewski was with her breasts exposed as she pumped.

109.  Ms. Lienczewski again, firmly, explicitly, yelled "get out!"

110.  Mr. Menke did not leave.

111.  Instead, he took the time to state that he thought the room was the "storage closet."

112.  Mr. Menke then closed the door and proceeded out of the room.

113. Due to this event, Ms. Lienczewski again felt humiliated and uncomfortable that Mr. Menke had just seen her pumping, in addition to Mr. Silveira, only a few days prior.

114. Distressed by this incident, Ms. Lienczewski was left feeling unsettled.

115. Importantly again, only a few employees had keys to Ms. Rocha's room and Mr. Silveira had promised that all staff were well aware of Ms. Rocha, the room Ms. Lienczewski was in, did not want anyone entering her room and that Ms. Lienczewski was pumping in that room.

116. Thus, no one should have entered, especially with a key.

117. Moreover, it was even more peculiar that Mr. Menke came into that room and claimed to think it was a storage closet when it was clearly not and that was a known fact to employees.

118. Ms. Lienczewski contemporaneously reported this event to her coworkers via text, reporting Menke entering the room, specifically stating, "[h]ow is this happening, first Bob [Silveira] now Menke (emojis for crying, sad, and a baby bottle) and I'm in the freaking dungeon. He said he thought it was a storage room."

119. After this event Ms. Lienczewski again reported the event to school leadership including the school Vice Principal Gregory Kelley ("Mr. Kelley").

120. In her complaints to school leadership, Ms. Lienczewski called it "absurd" that she had been told by Principal Silveira that she would have privacy and that she needed "security" that she could pump alone.

121. Ms. Lienczewski worked another several days, petrified of pumping and seeing nothing done as to her complaints about her lack of assignments, pumping space security, and the men that had walked in on her and lingered.

122. Just after that, Thanksgiving break started.

123. At that time, Ms. Lienczewski had only been back at work from FMLA for two weeks and not only had she had not only not been given a set assignment, or safe place to pump, but during

that short timeframe, two different men had walked in on her while she pumped and Ms. Lienczewski reported both to her coworkers and to the Principal, Mr. Silveira and the Assistant Principal Mr. Kelley.

124. Ms. Lienczewski felt that this treatment, following FMLA maternity leave and having a pregnancy-related medical condition, was unfair, discriminatory, and retaliatory.

125. However, matters became much worse immediately after returning from Thanksgiving Break.

126. In fact, the very next week after Thanksgiving break, on or about December 5, 2024, Ms. Lienczewski was suddenly and falsely accused of wrongdoing, which was not true, as verified by video.

127. By way of brief background, the Paras at JCJHS support students working toward meeting academic and behavior goals, including students with disabilities such as autism.

128. At times, students with disabilities such as autism can display unwanted behaviors due to being triggered by something in their environment.

129. For example, an autistic student with sensory issues can experience a "meltdown"—which is an involuntary response to a nervous system overload—when they are triggered by a stressful sensory input such as a door slamming or an unpleasant odor.

130. Meltdowns can then result in unwanted behaviors such as hitting and kicking, elopement, or withdrawing.

131. It is important to deescalate a meltdown as quickly as possible, as they can be dangerous for the individual experiencing them and others.

132. Paras like Ms. Lienczewski are taught to handle meltdowns and other manifestations of unwanted behavior through their trainings on Crisis Prevention Intervention ("CPI") training and certification.

133. Ms. Lienczewski has been CPI certified since 2005.

14

134. CPI trains those who care for students methods of de-escalation and the safety of students, often with developmental or learning disabilities and behavioral issues.

135. CPI training provides educators with a set of maneuvers that should be used to address certain behaviors.

136. For example, if a student is attempting to hit someone, the appropriate maneuver would be to block the hit with an open hand rather than grabbing hold of the student's arm or wrist with a closed fist.

137. Moreover, once Plaintiff started in this position as a para, she worked with other CPI trained educators and these educators shared the most used maneuvers with certain students.

138. At the time of the December 5, 2024 incident, Ms. Lienczewski had been a Para for about six (6) years and CPI trained and certified since 2005 and had been involved in many situations when she supported students with autism and/or sensory issues who were engaging in unwanted behaviors.

139. During her time at JCJHS, there was a particular student who struggled with sensory output as well as sensory input and had a particular issue with transitioning down the hallway when it was loud.

140. This child, O.M., was, the only child upon information and belief, who spent her full day in one room, due to her difficulty transitioning in the hallways because of her sensory, and behavioral issues related to her disability.

141. However, other paras and Ms. Lienczewski had to help O.M. transition in and out of school at the start and end of the day.

142. Note that due to O.M.'s frequent meltdowns, and her profound autism, upon information and belief, sometimes these transitions would take many minutes up to an hour.

143. Note that all Paras, including Ms. Lienczewski, had extensive experience handling O.M.'s difficult transitions, as well as the maneuvers used according to CPI.

144. Further, Ms. Lienczewski was usually just called in to help, and was rarely, if ever, the primary Para performing the transitions, and not alone.

145. On that day, just after Thanksgiving break, on or around December 5, 2024, JCJHS' Secretary, Ms. Heather Montigny (hereinafter "Ms. Montigny") texted Ms. Lienczewski inquiring if she was available to cover for Ms. Natalie Salvador (hereinafter "Ms. Salvador"), another Para staff member, in assisting student O.M.

146. On that day, like many others, O.M. was having difficulty transitioning through the common areas.

147. O.M. is profoundly autistic and suffers from debilitating sensory overload with sensory processing challenges, including but not limited to, being out in open spaces as well as being alongside her peers and loud noises.

148. In fact, this student's IEP notes that she can have a very difficult time transitioning.

149. Specifically, the Paras try to get O.M. through the halls as quickly and safely as possible and maintain her momentum.

150. If the momentum is lost, O.M. will "freeze"; when she freezes, this only exacerbates her anxiety as she would prefer to not be in common areas.

151. Further, when O.M. freezes, she tends to exhibit, unsafe behavior by sitting/laying down in the halls, stairwells, entryways, which can be highly unsafe for her and others during passing periods when the halls are full of other students.

152. Importantly, that morning, Ms. Lienczewski – who had frequent contact with O.M.'s mother - was informed by O.M.'s mother that her child was having a "difficult morning" and the mother said she did not "know what the day was going to look like."

153. O.M.'s mother told Ms. Lienczewski this in front of another Para, Ms. Karen Lloyd (hereinafter "Ms. Lloyd"), who ended up helping Ms. Lienczewski with the transition of the student to class.

154. On that day on or about December 5, 2024, O.M. needed to be escorted from the handicapped entrance at the rear of the building to the second floor where her classroom was located.

155. From this prior experience, Ms. Lienczewski knew that part of the Paras' duties were to wait and escort O.M. upon arrival to school.

156. Ms. Lienczewski also knew that because O.M. is prone to crippling anxiety when being out in open spaces, the goal is to get her as quickly and safely as possible to her next class.

157. Upon arriving to meet O.M., at first, Ms. Lloyd accompanied Ms. Lienczewski in getting O.M. to class.

158. Ms. Lienczewski, along with the assistance of at first one, and then later, two other Paras, Ms. Lloyd and Ms. Carol Pelletier (hereinafter "Ms. Pelletier"), had to transition O.M. successfully to the appropriate classroom.

159. On that day, while escorting O.M. to her classroom, O.M. dropped herself to the floor and sprawled across the hallway, several times, creating an unsafe situation for her as well as her peers.

160. As Ms. Lloyd and Ms. Lienczewski were tending to O.M., Ms. Pelletier came to assist with O.M.'s behavioral issue.

161. This exchange took roughly approximately forty (40) minutes, as O.M. was having extreme sensory difficulties at this time.

162. From recollection of the events, *and from Ms. Lienczewski having been eventually shown the video* which confirmed Ms. Lienczewski (and the other Paras) did nothing wrong, are as follows.

17

163. During this difficult transition the morning of December 5, 2024, O.M. sat on the floor on the first floor, then sat on the stairs in the stairwells when transitioning to the second floor, then again sat on the floor outside of the history classrooms in the eighth grade hallway and sprawled across the floor in the hall in front of the elevator between the eighth grade and seventh grade hallways.

164. The intended classroom is midway down in the seventh-grade hall.

165. For O.M.'s safety, and that of others – as well as the need to transition O.M. – O.M. had to be moved from sitting or laying on the floors in a high traffic area which creates a risk to O.M. and others.

166. Thus, during these events, therefore, the Paras had to use appropriate tactics to transition O.M. toward her classroom.

167. During all of these events, the tactics used by the three Paras, including Ms. Lienczewski, were tactics in line with CPI training/certifications, and were tactics used by Ms. Lienczewski's colleagues who had worked with O.M. for the three years that she been a student at JCJHS.

168. To be sure, all three Paras, including Ms. Lienczewski, used typical procedures and maneuvers to address O.M.'s particularly difficult behavioral challenges that day.

169. After the difficult time with O.M., and she arrived at her room, O.M. was fine.

170. In fact, O.M. went to her classroom and ended up having a good day; there were no further issues once she was in her preferred, sub-separate room.

171. Further, nothing seemed off with Ms. Lloyd or Ms. Pelletier with respect to their experience of the behavioral issue with O.M. that morning, as it was not uncommon.

172. In fact, both Ms. Lloyd and Ms. Pelletier went on with their days as normal, just as Ms. Lienczewski did.

173. In short, there was nothing concerning about the event other than that O.M. had a particularly difficult time in that transition, which again, was not uncommon.

174. Moreover, after the difficult time with O.M., no other staff member raised any issues and everything seemed normal with the handling of the situation with O.M.

175. Later that same day, on or around the afternoon of December 5, 2024, Ms. Lienczewski also was directed to escort O.M. for dismissal, out to her mother, which went much better.

176. However, after the dismissal, and Ms. Lienczewski being directed to escort O.M. the second time that day, matters changed drastically out of the blue.

177. Specifically, right after dismissal, Ms. Montigny sought Ms. Lienczewski out and requested that she meet Mr. Silveira in his office for a meeting.

178. Ms. Lienczewski entered Mr. Silveira's office, he was sitting at his desk; however, he was not alone.

179. Beside Mr. Silveira was Mr. Sean Scanlon, School District Director of Student Services (hereinafter, "Mr. Scanlon").

180. Further, standing beside the entryway of the door was Mr. Frank Murphy, Union President (hereinafter, "Mr. Murphy").

181. Ms. Lienczewski had never even met Mr. Murphy at any time prior.

182. In fact, there was a separate union representative within the building already, but that representative was not present.

183. Instead, the Union President was present.

184. Ms. Lienczewski was instructed by Mr. Silveira to enter the room and have a seat but to close the door behind her.

185. Ms. Lienczewski immediately felt something was very unusual.

186. After Mr. Silveira re-introduced Ms. Lienczewski to Mr. Scanlon, whom she had met a couple of times in the past, Mr. Scanlon stated firmly that "[i]t had come to [their] attention that there was an issue in getting the student to class."

187. Confused by this statement, Ms. Lienczewski responded, "I'm unaware of what the issue was."

188. Then Mr. Scanlon stated that they reviewed the video surveillance, which he claimed showed just Ms. Lienczewski and O.M.; he did not even make mention of the other two Paras that were equally involved in O.M.'s transition that morning.

189. Mr. Scanlon then said that Mr. Silveira had some concerns and that he had reported those to Mr. Scanlon.

190. Mr. Scanlon said he watched the video himself and determined there would need to be an investigation.

191. Mr. Scanlon stated the investigation was *only as to Ms. Lienczewski's actions and did not even mention the other two Paras who were equally involved in the transition of O.M. on that video*.

192. Mr. Scanlon then informed Ms. Lienczewski that she would then be put on paid administrative leave effectively immediately pending an "investigation into the incident."

193. Ms. Lienczewski was shocked.

194. In response, Ms. Lienczewski asked Mr. Scanlon, "[i]nvestigation of what?"

195. Ms. Lienczewski was very confused about what was going on.

196. Mr. Scanlon responded, the "issues getting the student to class."

197. JCJHS staff members and management, including Mr. Silveira, Mr. Scanlon, and Mr. Murphy, were well aware of O.M.'s difficulty transitioning to classes and previous instances

when O.M. engaged in unwanted behaviors while transitioning to classes like she had that day.

198. Ms. Lienczewski was therefore confused by the accusation and the need for an "investigation."

199. Ms. Lienczewski responded, "[t]here are issues with O.M. daily due to her sensory issues."

200. Mr. Murphy intervened and said that they would be able to discuss this further outside of the building.

201. Ms. Lienczewski was then asked by Mr. Silveira to gather her belongings and vacate the building, with instructions not to speak with any members of staff while doing so.

202. Also, Mr. Silveira requested that Ms. Lienczewski not attend that afternoon's home game for the girls' basketball team, that evening of December 5, 2024, *despite the fact that Ms. Lienczewski's own daughter* is part of that girls' basketball team.

203. Baffled, Ms. Lienczewski proceeded to leave Mr. Silveira's office and collect her things.

204. Ms. Lienczewski left the building of JCJHS.

205. Upon leaving the building, Mr. Murphy approached Ms. Lienczewski in the parking lot where her vehicle was located.

206. It was raining, thus making the conditions difficult to speak outside, so Mr. Murphy suggested they relocate to Ms. Lienczewski's car where it would allow them some privacy to discuss what transpired.

207. Mr. Murphy got into Ms. Lienczewski's car and they spoke.

208. Upon speaking, Mr. Murphy assured Ms. Lienczewski that "this type of event" calls for "a procedure" but that it would "go quickly."

209. Sitting in her vehicle, Ms. Lienczewski turned to Mr. Murphy and asked for further information on what the school leadership believed had transpired.

210. Mr. Murphy stated that he did not have many details about the incident, despite there being video of the event.

211. Mr. Murphy did, however, tell Ms. Lienczewski, "[t]hat there was a separate issue with another member of the staff and due to that event, it required Mr. Silveira to review all video surveillance footage."

212. The separate incident in question did not involve Ms. Lienczewski.

213. Mr. Murphy relayed that while Mr. Silveira was reviewing surveillance footage of students being transitioned to each of their classes, he deemed the manner "in which it was being done," with respect to O.M., inappropriate.

214. The statements about Ms. Lienczewski's treatment of the student being inappropriate in any way was false – even according to the Union President Mr. Murphy *at that time.*

215. Yet, all individual defendants including Mr. Murphy published these false statements to third-parties including other staff and individuals in the school, school district, and community so much so that it became a well known 'fact' in the community that Ms. Lienczewski had treated a student inappropriately or otherwise had performed misconduct in her job.

216. Ms. Lienczewski learned that the false allegations were made very public and thus Ms. Lienczewski began to have to be in uncomfortable situations when in public and at her children's schools which are in the same district in which she was accused of wrongdoing.

217. In fact, Ms. Lienczewski's *child* knew about the allegations and raised it to her mom, Ms. Lienczewski not long after the event, having heard it at school.

218. These false statements relate directly to Plaintiff's career and job and thus, defamation per se is invoked.

219. These false statements were published by all named defendants, including Union President Mr. Murphy to third parties over the next few months.

220. These false statements damaged Ms. Lienczewski's reputation significantly.

221. In fact, because of the false statements republished Ms. Lienczewski was either prohibited from attending, or too afraid to attend, or a combination, school events for her own children which continues today; the reputational harm from the republished false statements will continue to harm her reputation until her name is 'cleared' through this litigation.

222. Moreover, these false statements were published to third parties knowing they were false given the video itself, the Union President's statements in private to Ms. Lienczewski, and the fact that neither of the other Paras were accused of inappropriate behavior, yet took the same actions – which are common actions taken with the minor and taken by other Paras regularly.

223. Ms. Lienczewski even complained in the meeting that she and the other two Paras did the exact same maneuvers and she was the only one who was accused of wrongdoing and put out of work and investigated – the other Paras were not even questioned at the immediate time of these events.

224. Thus, these false statements were published and republished by the named defendants with at least negligence.

225. In short, the named defendants not only defamed Ms. Lienczewski's reputation, harm that is possibly irreparable, but also targeted her unfairly and without basis, resulting not just reputational harm, but economic loss and emotional distress for but being put out of work and eventually effectively terminated.

226. It is also notable that despite the fact that by dismissal, Mr. Silveira had already "determined" that there was an "issue" so serious as to O.M.'s treatment requiring that Ms. Lienczewski be placed on leave and investigated, *that Ms. Lienczewski had been directed to escort O.M. a second time at dismissal that day.*

227. It is also notable that if Mr. Silveira determined that Ms. Lienczewski's behavior (which again was the same as the other two Paras) was so serious it required immediate administrative leave and an investigation, that DCYF was not called right away, upon information and belief, especially because she was directed her to have a second contact later that same day with O.M.

228. The school is a mandated reporter.

229. Had Ms. Lienczewski done wrong, she should have not been left to work the rest of the day with children, especially O.M.

230. During the conversation with Mr. Murphy in Ms. Lienczewski's car, Ms. Lienczewski asked more questions as none of the situation made sense.

231. Mr. Murphy, the Union President, just continued to state that after Mr. Silveira reviewed the footage, he felt "compelled" by what he had seen to report his findings to Mr. Scanlon.

232. Again, the other two Paras involved in O.M.'s transition with Ms. Lienczewski, Ms. Lloyd and Ms. Pelletier, were not, upon information and belief, even questioned for a long period of time and until after Ms. Lienczewski complained about her sole targeting.

233. Moreover, upon information and belief, Ms. Lloyd and Ms. Pelletier were not written up, although the school claimed they were in its position paper, which made no sense because there is an ongoing text chain with this group and nothing was ever said by the other Paras about writeups.

234. Finally, Ms. Lienczewski was the only one of the three Paras that was put out on administrative leave, investigated, and later, threatened with reporting her to DCYF if she did not resign and sign a Non-Disclosure Agreement ("NDA").

235. Further, in addition to the fact that the two other Paras, Ms. Lloyd and Ms. Pelletier were involved in the morning transiting of O.M. and used the same tactics or maneuvers as Ms.

Watson, according to their training, Ms. Lienczewski had seen other Paras regularly use the same techniques when O.M. was having a difficult time, including but not exclusive to, Ms. Salvador, who is O.M.'s main Para and Kara Bowden.

236. Importantly, no other Para had ever been investigated or put on administrative leave for using the techniques used by Ms. Lienczewski and the other two Paras with O.M. that morning, upon information and belief.

237. On the video, upon information and belief, all three Paras were seen doing the same types of maneuvers on that and other days.

238. Yet, Ms. Lienczewski was the only one to be investigated and put on administrative leave.

239. As Mr. Murphy and Ms. Lienczewski closed out their conversation that day of December 5, 2024, in Ms. Lienczewski's car, Mr. Murphy promised that he would "hopefully receive more information in the following days" and to "go home" in the meantime.

240. Ms. Lienczewski received no correspondence from the school administration or members of its staff for a week.

241. On or around December 11, 2024, Ms. Lienczewski received a phone call from Ms. Montigny, Mr. Silveira's secretary, asking if she would be available to come in.

242. Ms. Lienczewski agreed to the meeting and her union representative was again to be not the representative normally provided in that building but, instead, Mr. Murphy, the Union President.

243. On or around December 11, 2024, Ms. Lienczewski arrived at JCJHS for the meeting as requested by Mr. Silveira.

244. Before entering the building, Mr. Murphy stated to Ms. Lienczewski that she would need to "share [her] account of the incident."

245. Ms. Lienczewski questioned Mr. Murphy, "what exactly did they want to know."

246. Mr. Murphy then informed Ms. Lienczewski that, "they already outlined this in a letter that was sent to you."

247. In response, Ms. Lienczewski told Mr. Murphy that she had received no letters from the administration.

248. Mr. Murphy then told Ms. Lienczewski that the "letter went out on Monday, December 9, 2024," which was only four (4) days after the incident.

249. To be clear, Ms. Lienczewski had not received the letter Mr. Murphy was referring to that he said the school sent.

250. *At the meeting* Mr. Murphy produced a copy of the letter that he was referring to which was a notification of paid administrative leave and formal hearing with intent to suspend or terminate her.

251. This letter was sent directly from the Superintendent of Schools, Mr. Scott Holcomb (hereinafter, "Mr. Holcomb") and was addressed to Ms. Lienczewski.

252. This letter began by stating that it had been brought to Mr. Holcomb's attention that certain allegations had been made regarding Ms. Lienczewski's conduct in the workplace as reported by Mr. Silveira.

253. Further, in this letter, it outlined three specific maneuvers the Paras did in the transfer of O.M.

254. The letter stated Ms. Lienczewski allegedly, "dragged a rug with a student sitting on it, picked up said student from a sitting position by putting [her] arms under said student and carrying [her] down the hall in the same fashion."

255. The letter further alleged, "[o]nce said student was sitting on the floor, it was noted that you slid said student along from behind by pushing with your knee and upper leg."

256. Lastly, this letter stated, "[d]uring the investigation, you have a right to be represented by an attorney and to have a union representative present."

257. These statements were false and were published in the letter by one or more defendants and the allegations from which were repeated by all defendants.

258. After reading the letter and during this conversation with Mr. Murphy, Ms. Lienczewski specifically stated to Mr. Murphy, "I do not have a lawyer, should I continue going into this meeting?"

259. It was then that Mr. Murphy assured Ms. Lienczewski that it would be "okay."

260. Mr. Murphy was not telling the truth that it would be "okay" or that the process would be short.

261. Mr. Murphy further stated to Ms. Lienczewski that, "[h]e had never seen a lawyer brought in at this stage."

262. Ms. Lienczewski trusted Mr. Murphy's assurances as to not needing legal representation, so she agreed to continue into the meeting with just her union representative.

263. Mr. Murphy and Ms. Lienczewski entered Mr. Silveira's office.

264. Mr. Scanlon and Mr. Silveira were both present and seated at a desk.

265. During the meeting, Mr. Murphy asked Ms. Lienczewski to share her recollection of the alleged incident that took place on or around December 5, 2024, with the transition of O.M. getting to class.

266. Ms. Lienczewski proceeded to give her detailed account, per Mr. Murphy's request, despite the event being on video.

267. Ms. Lienczewski began to explain each procedure or maneuver that she and the other Paras took with O.M. the morning on or around December 5, 2024.

268. In fact, Ms. Lienczewski specifically pointed out that two other Paras, Ms. Lloyd and Ms. Pelletier, who assisted her with the transfer of O.M., were involved in all the actions taken with O.M. that morning, but that none did anything improper.

269. Moreover, Ms. Lienczewski stated to Mr. Silveira and Mr. Scanlon that she had witnessed those specific procedures or maneuvers used, frequently, by the other Paras who were typically assigned to O.M.

270. Mr. Silveira then referred again to the video surveillance footage he claimed to have reviewed on or about December 5, 2024

271. Following Mr. Silveira's remark about having seen video surveillance footage of the alleged incident, Ms. Lienczewski requested to see the video.

272. In fact, Ms. Lienczewski had to insist on seeing the video that they were referring to which allegedly provided the sole basis for all allegations against her yet defendants still would not show her the video.

273. Ms. Lienczewski stated to Mr. Silveira and Mr. Scanlon that, "I am on that video, I would like to see it."

274. In response, Mr. Scanlon said "you can certainly ask."

275. Ms. Lienczewski said, "I am asking."

276. Mr. Scanlon said "ok."

277. Ms. Lienczewski said, "you can either show me or I can submit a public records request, but either way you need to show me."

278. Mr. Scanlon and Mr. Silveira would not let Ms. Lienczewski watch the video.

279. Ms. Lienczewski then stated that she no longer felt comfortable answering any questions they may have about the alleged incident that occurred on or around December 5, 2024, without seeing the video which was the basis for all of the allegations against her.

280. Mr. Scanlon then responded by saying that he was going to "run [her] request by the superintendent and the school's attorney" and would get back to her.

281. The meeting then concluded.

282. Mr. Murphy and Ms. Lienczewski proceeded to leave the meeting.

283. Following this meeting, specifically on or about December 11, 2024, Ms. Lienczewski finally received the letter that Union President Murphy showed her during the meeting.

284. Another approximately five (5) more days went by and Ms. Lienczewski became increasingly distressed as she heard nothing from the school about her right to see the video which demonstrated the basis for all allegations against her.

285. During that time, Ms. Lienczewski sat out of work not knowing what was going on and not understanding the allegations against her.

286. On or around December 16, 2024, Ms. Lienczewski could not wait anymore; it was extremely stressful sitting out of work not knowing what was going on, especially with a newborn and other children at home and the need for her job.

287. Thus, on December 16, 2024, Ms. Lienczewski texted Mr. Murphy asking if he had heard anything back regarding the investigation.

288. Mr. Murphy replied informing Ms. Lienczewski that he had not heard anything back from the administration regarding the investigation.

289. Two (2) more days went by as Ms. Lienczewski sat out of work, in significant distress, not knowing what was going on.

290. On or around December 18, 2024, Ms. Lienczewski finally received a phone call from Ms. Montigny requesting her to schedule a meeting.

291. Ms. Lienczewski responded to Ms. Montigny that she would send an email.

292. On or around the afternoon of December 18, 2024, Ms. Lienczewski sent the following email to Mr. Silveira, Mr. Scanlon and Mr. Murphy:

"Good afternoon, I've just gotten off the phone with Heather Montigny, a dear friend and beloved secretary at Joseph Case Junior high school. She had asked if I would be available tomorrow at 1PM to meet to look over the video footage that I had requested a viewing of.

Unfortunately, due to an accident that my son had yesterday at school I am unable to leave him at that time and am not available. As I discussed with Mrs. Montigny, I am uncomfortable due to the nature of our relationship and her role with our employer and going forward would prefer that communication be made by email, traditional mail or communication through administration building staff or Mr. Silveira himself. This way I can continue to keep this investigation private and maintain a separation of both my personal and professional relationships."

293. In response to this email, Mr. Silveira noted that moving forward all communication would be conducted via email.

294. In his email, Mr. Silveira also requested Ms. Lienczewski's availability for December 20, 2024, to review video surveillance footage which she had requested to view over a week prior, on or about December 11, 2024.

295. Ms. Lienczewski responded that she agreed to the meeting on or around December 20, 2024, and stated that Mr. Murphy would again be her union representative for this meeting.

296. Prior to the meeting, Ms. Lienczewski had questioned Mr. Murphy if she should also be accompanied by legal representation.

297. Again, Mr. Murphy assured Ms. Lienczewski that would not be necessary.

298. On or around December 20, 2024, at or around 8:30 a.m., Mr. Murphy, Mr. Scanlon, Mr. Silveira, and Ms. Lienczewski gathered at JCJHS to review the video surveillance footage she had requested to see over a week prior.

299. Notably, Defendants' claimed untruthfully in response to paragraph 125 of their position paper with the commission that "O.M would not go through the same handicap door following the incident."

300. Such a claim is untrue because on December 20, 2024, upon arriving at her meeting, Ms. Lienczewski saw O.M. enter through that same handicap door, without issue.

301. Within the meeting, Ms. Lienczewski got ready to view the video – finally.

302. While reviewing the video surveillance footage, Ms. Lienczewski thoroughly narrated and explained each maneuver that she was taking to aid O.M. successfully in transitioning through the halls to the next class.

303. Furthermore, there were several different videos, each with different angles from various camera locations on that December 5, 2024, difficult transition had taken place across various parts of the school.

304. Ms. Lienczewski watched the videos intently.

305. Specifically, Ms. Lienczewski repeatedly asked for each video to be rewound and she rewatched them explaining and narrating the appropriate actions she took.

306. Importantly, the video footage clearly showed the two other Paras, Ms. Lloyd and Ms. Pelletier, along with Ms. Lienczewski, all jointly assisting O.M. with the same maneuvers, jointly trying to assist O.M. to her class safely and appropriately.

307. After reviewing the surveillance footage, Mr. Murphy then stated to both Mr. Scanlon as well as Mr. Silveira that he was "unsure" as to why Ms. Lienczewski was "placed on administrative leave" because he found "nothing of note" to be a "cause for concern" after reviewing the videos.

308. In fact, Mr. Murphy commended the staff members, including Ms. Lienczewski, for their "exemplary patience in what he witnessed to be a very difficult situation."

309. Both Mr. Scanlon and Mr. Silveira sat straight-faced and cold, in silence.

310. Notably, Mr. Murphy was making statements in line with the school's false allegations and publishing the false statements to third parties when away from Ms. Lienczewski.

311. Neither the Union or Mr. Murphy "employed" Plaintiff.

312. Mr. Murphy breached a duty to Plaintiff with his 'representation' of Ms. Lienczewski through this whole several month long event.

313. Before the meeting concluded, Mr. Scanlon responded to Mr. Murphy that he would need to discuss it with the superintendent of the school system.

314. The meeting concluded.

315. Ms. Lienczewski had even more questions as to why she was on administrative leave after seeing the video and hearing Mr. Murphy's reaction.

316. Upon information and belief, especially with dissuading her from bringing counsel to two meetings when she was wrongfully accused of misconduct with a student, but in other respects as the facts above outline, acted without due care for Ms. Lienczewski.

317. At the time of this meeting, the school was just about to start winter break at JCJHS so Ms. Lienczewski was concerned she would not know of a possible outcome until school was back in session.

318. It distressed Ms. Lienczewski greatly to go through the winter break and the holidays, still not knowing what was going to happen to her job that she needed.

319. Moreover, after seeing the video, and the more time that elapsed, Ms. Lienczewski had more questions than ever about why she was on administrative leave and being threatened with termination, pursuant to the letter she was shown during the last meeting and received on or about December 11, 2024.

320. During all of break, Ms. Lienczewski never received any communications or correspondence from the school regarding the alleged incident that took place on or around December 5, 2024.

321. At the end of break, which marked approximately *a month* on administrative leave, Ms. Lienczewski finally heard from Mr. Murphy.

322. Specifically, on or around January 2, 2025, Ms. Lienczewski received a phone call from Mr. Murphy.

323. During this phone call, Mr. Murphy stated that he had heard from Mr. Scanlon and that a letter of termination would be sent certified mail to Ms. Lienczewski.

324. In shock, Ms. Lienczewski asked Mr. Murphy on what grounds she was being terminated.

325. Mr. Murphy oddly stated that "they are still deciding."

326. Furthermore, Mr. Murphy stated that they were urging Ms. Lienczewski to send in a letter of resignation as opposed to her being terminated.

327. In disbelief, Ms. Lienczewski responded to Mr. Murphy's statement, questioning, "why would I quit my job?"

328. Ms. Lienczewski explained to him that she loved her job and wanted to remain at JCJHS as a Para.

329. Ms. Lienczewski not only loved her job and needed the income, but her kids went to that school, she had been the basketball coach, and the job was a short commute.

330. Not only would it be difficult to find a job as close to her home as that job, but her reputation would be (potentially) permanently harmed given the false allegations had become public.

331. Ms. Lienczewski questioned Mr. Murphy about her options as she would not resign, did not want to be fired, and did not understand the grounds for any such termination.

332. Moreover, according to Mr. Murphy, even the school was "still deciding" the basis for the termination.

333. Thus, termination for made no sense to Ms. Lienczewski and caused extreme distress.

334. Plaintiff believed the threat of termination, starting with the false allegations from December 5 2024, was retaliation for having taken FMLA, having requested accommodation to express breast milk, in retaliation for reporting the sexual harassment of Mr. Silveira and Mr. Menke by their actions walking in and lingering as Ms. Lienczewski pumped breast milk.

335. Thus, the December 5, 2025, allegations of wrongdoing and all subsequent events involving Defendants were pretextual to remove her to cover up their intent.

336. Mr. Murphy just kept repeating himself, stating that "they would be sending [] a letter of termination if [she did not] resign."

337. Mr. Murphy's repetitive statement felt and sounded like a threat by her own union president, a union which is obligated to protect employees' rights.

338. Mr. Murphy furthermore finally added more detail, disclosing that "they wanted [her] to consider voluntary resignation and to be willing to sign a non-disclosure agreement."

339. Mr. Murphy specifically noted that the school requested that Ms. Lienczewski "put [her] voluntary resignation in writing."

340. Worse, during this conversation, Mr. Murphy began to blatantly 'sell' Ms. Lienczewski into quitting and signing an NDA in exchange for *not being reported to "state agencies" (i.e. DCYF)* and having the school not contest her unemployment.

341. Ms. Lienczewski was shocked as to all of those conditions and what seemed like a clearly odd way to terminate or remove an employee – with threats and inducements.

342. Further, Ms. Lienczewski was particularly shocked by the threat of the school reporting her to DCYF <u>that long after the event</u>[3] since the school was a mandatory reporter – meaning, if an event warranting DCYF involvement had occurred on December 5, 2024, *the school had a duty to report it to DCYF weeks prior to that threat immediately after the incident* but did not; instead, defendants only threatened to report Ms. Lienczewski to DCYF as a threat *if* Ms. Lienczewski refused to concede to resigning and signing an NDA.

---

[3] Notably, from a legal perspective, this unconscionable threat was reduced to writing in a January 3, 2025, email to Ms. Lienczewski, in her possession, which copied Mr. Murphy and Superintendent Mr. Holcomb.

343. At that point, Mr. Murphy did not explain the other terms in the soon-to-come email, which *also* required Ms. Lienczewski to not only quit, sign an NDA, but also to agree the school was not liable to her *and sign a comprehensive legal release – where Ms. Lienczewski would be agreeing to waive all legal claims <u>she had against the school for the harm Defendants caused her.</u>*

344. Mr. Murphy, in line with a later January 3, 2025, email from Mr. Scanlon, continued to 'sell" Ms. Lienczewski on resigning by stating that not only would the school not report her and not contest her unemployment benefits, the school would write her a "neutral" letter of recommendation.

345. Ms. Lienczewski was shocked by the blatant threat to push Ms. Lienczewski out after doing nothing wrong.

346. This was all shocking especially because in several prior conversations with Mr. Silveira, he had referred to Ms. Lienczewski as a "phenomenal person and great with children."

347. Notably, in Defendant's position paper to the commission it denied the above commendation of Ms. Lienczewski.

348. However, unless the school has since altered its version of Ms. Lienczewski's performance review, it stated this *same commendation* of Ms. Lienczewski in her *annual review* in addition to Mr. Silveira stating this to Ms. Lienczewski verbally.

349. As the conversation continued with Mr. Murphy that day on or about January 2, 2025, Ms. Lienczewski was extremely upset and confused by Mr. Murphy's statement regarding possible reports to DCYF and questioned what the school even had to report based on Mr. Murphy's and her collective viewing and recollections of the actual video.

350. Mr. Murphy stated that he "did not know what they would report."

351. The fact that even Mr. Murphy claimed to not know what the school was alleging Ms. Lienczewski did wrong, after he had viewed the video and responded – in front of Mr. Scanlon, Mr. Silveira, and Ms. Lienczewski, on December 20, 2025, that he saw no issue – while Mr. Murphy also relayed to Ms. Lienczewski that if she did not resign and waive all legal claims, that the school would report her to DCYF, was even more confusing.

352. Ms. Lienczewski reminded Mr. Murphy that they were mandated reporters and as such, were legally obligated to report any known or suspected abuse of a child *long before that point in time*.

353. Specifically, Ms. Lienczewski told Mr. Murphy that because they were mandated reporters, if such abuse was seen, they had a legal obligation to report it to DCYF immediately as Ms. Lienczewski understood the reporting requirements and school policy to protect children from 'abusers'.

354. Furthermore, Ms. Lienczewski stated it should have been reported if, in fact, the alleged abuse had occurred.

355. Mr. Murphy stated that he personally "did not witness any abuse" on the video surveillance.

356. Ms. Lienczewski responded to Mr. Murphy that, "if neither one of us saw abuse, and if the other two paraeducators who were assisting the student that day were not being investigated, then I should not be reported."

357. Mr. Murphy did not have a substantive answer to this very logical observation.

358. Ms. Lienczewski again stood firm to Mr. Murphy that she did not want to quit her current position and wanted to remain working at JCJHS – again her kids were there, she coached the basketball team, and the commute was close, not to mention that she needed and loved her job.

359. In response to Ms. Lienczewski's statement of wanting to remain at JCJHS, Mr. Murphy became firm and gave her two flat options: "willingly resign or be terminated."

360. More importantly, Mr. Murphy then more strongly pushed Ms. Lienczewski to resign and disclosed more terms the school had.

361. Mr. Murphy then reiterated that if Ms. Lienczewski wanted to seek employment elsewhere, she would also "need to agree" that "no party is liable" and waive all legal claims against school and potentially all defendants.

362. The entire situation from the threats (DCYF) to 'inducements' including a "neutral" letter of recommendation and "not contesting" unemployment made even less sense given that the school wanted her to release it from all claims of liability that *Ms. Lienczewski had against the school.*

363. In other words, Ms. Lienczewski understood the offer from her employer was *that she had to admit the school had no liability, commit to complete confidentiality and release the school from any claim of wrongdoing against her*, in return for the possibility[4] of unemployment payments and avoiding having false allegations, which were disproved by the video and Mr. Murphy's prior statements, levied against her to DCYF.

364. At that point, Ms. Lienczewski felt that this highest-level union representative was part of the school Defendants' attempt to rid themselves of her and trying to brush the false allegations 'under the rug' and thus, Ms. Lienczewski's trust of Mr. Murphy ran out.

365. Thus, Ms. Lienczewski started to question Mr. Murphy as to why he was not willing to "do more" for her regarding the alleged incident that took place on or around December 5, 2024, where they both agreed – upon seeing the video – that she had done nothing wrong and also

---

[4] An employer not contesting unemployment does not guarantee unemployment awards, especially with a resignation, as this is a matter decided by the state and resignation is often not found to warrant unemployment benefits.

because nothing similar had happened to the two other Paras involved in O.M.'s transition that day.

366. Mr. Murphy stated that he "does not agree with JCJHS" and that it "wasn't right at all," but then continued to push Ms. Lienczewski to resign, stating that she would be able to "get a job anywhere."

367. Ms. Lienczewski expressed to him strongly that this situation was "about my reputation," which had already been "tarnished by these false allegations."

368. Ms. Lienczewski expressed to Mr. Murphy the magnitude of harm already done to her by accusing her of alleged abuse, especially being a mother of four children.

369. By that point, only a month after the incident, the false allegations were already well known to Ms. Lienczewski's coworkers, neighbors, friends, let alone her kids, in that small town.

370. As noted, even Ms. Lienczewski's children, who was enrolled at JCJHS, knew of the incident and her later termination; worse, her kids heard this from their peers so the false allegations and statement were republished through the school – and town.

371. The threat of termination and a false report to DCYF was distressing, but even more distressing was the damage to Ms. Lienczewski's reputation — which had already occurred and *grew over time, and continued to grow* given the small town Ms. Lienczewski lives and worked in.

372. Ms. Lienczewski had became increasingly fearful of seeing people she had known for years in public due to the false allegations harming her reputation.

373. This was especially true after the school and Mr. Murphy were threating termination if she did not resign.

374. Ms. Lienczewski raised all of these concerns with Mr. Murphy who just kept urging her to take the school's 'deal.'

375. Ms. Lienczewski then raised to Mr. Murphy how the December 5, 2025, allegations occurred literally weeks after returning from FMLA, requesting to have a private place and time to pump (which was not provided until Ms. Lienczewski pushed), complaining about not having a private place to pump, then being walked in on half-naked twice by two different men – including her accuser Mr. Silveira – and formally reporting both incidents of sexual harassment to Mr. Silveira himself, and to the Vice Principal Mr. Kelley.

376. Moreover, Ms. Lienczewski raised to Mr. Murphy the differential treatment between herself and a male educator who had – months early in or around October of 2024 – been accused of assault, but did not have a video to exonerate him, and he was still out on leave and *not* fired – or threatened – upon information and belief.

377. In fact, in the above incident, the male educator had been *actually* reported to DCYF by the parents, yet none of what was happening to Ms. Lienczewski occurred to this similarly-situated male educator.

378. Ms. Lienczewski raised all of this to Union President Mr. Murphy and his response was to just push her to take the school's offer or said nothing.

379. Ms. Lienczewski ended the conversation with Mr. Murphy confused, feeling persecuted for no reason, and highly distressed.

380. The next day, on or about January 3, 2025, Ms. Lienczewski received an email from Mr. Scanlon, forwarded by Frank Murphy, Union President, which parroted what Mr. Murphy said the full deal was the day before with Ms. Lienczewski.

381. The email was originally sent by Mr. Scanlon to Mr. Murphy and Superintendent Mr. Holcomb originally, then forwarded by Mr. Murphy to Ms. Lienczewski.

382. The email states that "in consultation with Superintendent Holcomb" that the email "would like to propose the following agreement" that was "conditional upon Amber Watson's voluntary resignation" and proceeds to provide the "key terms."

383. The first "key term" was the voluntary resignation and most of the remaining six "key terms" were obligations of Ms. Lienczewski or threats, effectively.

384. Among the threats were that Defendant would "not contest" the unemployment benefits, versus fight her unemployment; however, by its own language, that key term recognized that it is the state that decides if unemployment is awarded, not Defendants.

385. The other threat was titled "Reporting" and stated, "the district will not make _additional reports_ to state agencies regarding the employee.."

386. The words "additional reports" was confusing as Ms. Lienczewski was never contacted by any state agency, or notified of the involvement of any state agency or informed of any reports about her to start with.

387. The remaining terms – in return for the school _not reporting false allegations to the state_ and "not contesting" (versus fighting) unemployment – required Ms. Lienczewski to not just voluntarily resign but to sign a "Nondisclosure" Agreement" ("NDA"), to accept "No Admission of Wrongdoing [by the school]," and required Ms. Lienczewski to sign a "General Release" which, by its very terms, would release the school from _all legal claims_ **Ms. Lienczewski had against the school**.

388. The one "inducement" other than not contesting unemployment and not making false allegations, in return for Defendants obtaining Ms. Lienczewski's consent to sign a NDA, agree the school had no liability as to her, and for Ms. Lienczewski to waive all legal claims _she has_ against the school, was a "neutral letter of recommendation."

389. Ms. Lienczewski was shocked by the offensive letter and that her Union, and its president Mr. Murphy, was urging her to agree with.

390. The letter ended by claiming that the "proposed agreement aims to address the situation in a professional and equitable manner for all parties involved."

391. However, that offer had no equity for Ms. Lienczewski.

392. The letter required a response only days later, by January 7, 2025.

393. On or around January 6, 2025, Mr. Murphy called Ms. Lienczewski to again try to push Ms. Lienczewski to accept the proposal the administration was offering her.

394. Mr. Murphy then added his *own* threats.

395. Despite him admitting she did nothing wrong, Mr. Murphy threatened that "he feels the union would not be willing to cover any attorney fees if [she] decided to take legal action" which Ms. Lienczewski took as the union saying, through its president, that it refused to perform its obligations to protect her from her employer.

396. Additionally, during this conversation Mr. Murphy also threatened her in another way; he stated that if Ms. Lienczewski told him that she "wanted them to terminate [her], the checks would stop right away."

397. Ms. Lienczewski then responded to Mr. Murphy that "the checks were going to stop whether [she] was terminated or resigned."

398. Mr. Murphy then asked Ms. Lienczewski what her response would be regarding the proposal the Defendants were offering her.

399. Ms. Lienczewski told Mr. Murphy she would not sign a non-disclosure agreement, say her employer had no liability, or waive all claims – and she did not want to quit.

400. Ms. Lienczewski believed that wrong had been done by the Defendants to her, and that her reputation had been badly tarnished in the small town she had been in her whole life and that her reputation "was more important than anything else."

401. On January 7, 2025, Ms. Lienczewski emailed Mr. Scanlon, Mr. Silveira, and Mr. Murphy, thus also noticing the school district and Superintendent Mr. Holcomb, that she refused to resign.

402. Moreover, this email registered a series of detailed complaints about the aforesaid events regarding FMLA retaliation, sex discrimination, sexual harassment, failure to provide time and space to express breast milk, and retaliation – complaints previously made verbally and were not addressed.

403. In that email, Ms. Lienczewski raised concerns again about how no wrongdoing was done on her part and that she was only performing a normal function of the job.

404. Ms. Lienczewski also pointed out in her formal complaint email how out of three paraeducators aiding in the assistance of a student, she was "the only one sent home on paid administrative leave for an 'investigation.'"

405. Further in this email, Ms. Lienczewski stated that the alleged incident which resulted in the "investigation" was only "three weeks after her return from FMLA where [she] was not debriefed on any change in policy or procedure, nor was [she] given an assigned role and a schedule."

406. Specifically in this email, Ms. Lienczewski noted that, "I'm very aware that had there been any signs of abuse any and all parties would have had to report any questionable behavior immediately."

407. Ms. Lienczewski also stated in this formal complaint email that it had "been made clear to me that nothing has been reported" as there was "absolutely no signs of abuse in that video."

408. In this email, Ms. Lienczewski also reported the differential treatment as to the male co-worker in the same building who was accused of assaulting a child, and he was on paid administrative leave but was not, upon information and belief, being threatened with reports to DCYF by the school, or threatened with termination if he did not resign.

409. Notably, upon information and belief, this other male teacher was reported to DCYF by the child's parents, which is completely different than Ms. Lienczewski's situation.

410. Ms. Lienczewski further pointed out that in that male teacher's case, there is "no video evidence to exonerate him unlike myself."

411. In this January 7, 2025, email where Ms. Lienczewski was re-reporting her prior verbal complaints about her treatment, she expressed concerns about the timing of the sudden false allegations (where she was the only one of three Paras targeted for termination).

412. Specifically, Ms. Lienczewski complained that she had just come back from FMLA/maternity leave and was not provided time or space to pump; she further complained that in a short time she had been walked in on while pumping twice — by two different men including Principal Silveira, who initially levied the false claims of abuse against Ms. Lienczewski.

413. On or around January 7, 2025, Ms. Lienczewski received an email from Mr. Scanlon.

414. Mr. Scanlon informed Ms. Lienczewski that he had received her response and had thus shared it with the Superintendent, Mr. Holcomb, and that he would be addressing this matter moving forward.

415. Upon any report (including the prior verbal reports) under school policy, the school administration and HR have a duty to investigate and remedy any discrimination or retaliation with swift remedial measures.

416. Thus, certainly upon a formal written report on January 7, 2025, along with Mr. Scanlon's statement that he would be addressing the matter, the Defendants had a duty to investigate the

matter and take swift remedial action – and certainly *not* to retaliate against Ms. Lienczewski, such as by terminating or suspending her.

417. Despite that duty, the school defendants, nor the union, took any action in response to reports of discrimination and retaliation under state and federal law.

418. Following Ms. Lienczewski's complaints of discrimination, retaliation, and failure to accommodate, on or around January 7, 2025, she was just left out on administrative leave with no communication whatsoever – for *months more*.

419. Importantly, despite Ms. Lienczewski having made protected reports of discrimination and retaliation, as well as failure to accommodate lactation, she never heard back from the school about any investigation into her reports.

420. More specifically, Ms. Lienczewski did not hear from the school, Mr. Holcomb, or the Union President Mr. Murphy *until she filed her charge of discrimination* with the Massachusetts Commission Against Discrimination (MCAD) which was five (5) months after these events.

421. Filing a complaint with the MCAD is a protected act under state law 151B and Federal laws applicable to the claims in this complaint.

422. Yet, following filing with the MCAD complaint filing and nearly five (5) months later after the events, on or about May 5, 2025, Plaintiff received Defendants' April 30, 2025 letter from Superintendent Mr. Holcomb, titled "notice of intent to suspend or terminate employment."

423. After the protect acts of the January 7, 2025, formal complaint and re-report of discrimination, retaliation, and failure to accommodate, and the filing with the MCAD, Plaintiff was protected from retaliation.

424. Despite that, a "notice of intent to suspend or terminate employment" is retaliatory action that is unlawful under several laws implicated in this complaint.

425. The aforesaid is especially true given the investigation into the "allegations" against Ms. Lienczewski were long since resolved months ago.

426. The aforesaid is especially true given there was no discernable investigation into Ms. Lienczewski's formal complaints – despite months of time to do so.

427. Moreover, by the time the letter reached Ms. Lienczewski on or about May 5, 2025, she had days to find a lawyer and had no trusted union representative to attend the required hearing with on the dictated date of May 9, 2025.

428. Given past dealings with Mr. Murphy, and the fact that he was the *President* of the whole union in that district, Ms. Lienczewski did not feel the union was protecting her at all and in fact, was working against her interest and adding to her reputational harm and damages.

429. At that point, Ms. Lienczewski had no choice but to resign.

430. Thus she was effectively terminated or constructively discharged because she had no choice but to resign or she would face threats to her unemployment *and reports to DCYF.*

431. Any reasonable person in her situation, having been left out of work for half a year with no communication, false allegations, and threats if claims against the school were not waived and NDA signed along with her resignation and acceptance of the school having no liability for what it did to her - who also formally reported unlawful discrimination, retaliation, and failure to accommodate with no investigation – that now faced what would undoubtedly be a biased hearing, would feel they had no choice but to resign.

432. Thus, Ms. Lienczewski was terminated by and/or constructively discharged through a May 8, 2025, letter.

433. The intent to terminate or suspend letter and the hearing were just an act of the Defendants attempting to cover what had already been a termination just not made formal.

434. All defendants' acts aforesaid as so shocking they shock the conscience.

435. As a result of all of this, Ms. Lienczewski suffered severe emotional distress.

436. However, due to the reputational harm she continues to suffer severe humiliation and emotional distress.

437. Since that time in May of 2025, Ms. Lienczewski has faced tremendous humiliation and anxiety in public on numerous occasions due to the false allegations or due to having to explain to parents that she no longer worked there (and get deal with the question of "why"), as well as not be able to attend her children's school events.

438. For example, in or around November of 2025, Ms. Lienczewski could not go into her daughter's basketball tryouts due to anxiety; she sat outside of the Junior High and waited for her daughter to come out from basketball tryouts.

439. Ms. Lienczewski was too anxious to go inside, so she just waited in her car hoping her daughter was doing great.

440. This type of anxiety related to her children's school (and her former employer) have gone on for months and will continue until she is exonerated.

441. As another example of the humiliation these events have caused is that, due to the allegations of child abuse, Ms. Lienczewski had to stop helping with girl scout meetings since they took place at the school.

442. Ms. Lienczewski's doctors, due to these events, have had to prescribe her antidepressants and drugs to sleep, even while she was breastfeeding (and now additional pregnancy), due to her anxiety and humiliation in public.

443. The humiliation of Ms. Lienczewski continued into the 2025-2026 school year due to blatant and intentional harm and defamation by Defendants.

444. Specifically, Ms. Lienczewski was contacted by her daughter's peers at the end of the summer as they were excited to see Ms. Lienczewski was assigned as the teaching assistant to their classrooms.

445. Ms. Lienczewski had to tell these children that "it must be a mistake" and that she was not in their classroom.

446. Then Ms. Lienczewski was sent a picture where Ms. Lienczewski saw she was on the upcoming school schedule, and thus, Ms. Lienczewski has proof of Defendants' further acts which humiliated Plaintiff and caused her great anxiety.

447. Ms. Lienczewski then reached out to a friend / former colleague who is in charge of assigning classrooms for the following year at the junior high and she was completely unaware that Ms. Lienczewski was not returning and thus, she had assigned Ms. Lienczewski to several classrooms and gave her a full schedule.

448. That schedule went out to many students and parents including those with an IEP that Ms. Lienczewski had worked with and their parents.

449. The following week there was an open house that Ms. Lienczewski had to overcome her anxiety and attend for her children.

450. However, while she forced herself to attend, the humiliation continued once in attendance.

451. During the open house, several parents approached Ms. Lienczewski enthusiastically that they had seen she was assigned to their child's classrooms and Ms. Lienczewski had to inform them that she was not working in Swansea this upcoming year.

452. Others Ms. Lienczewski saw seemed to know about the allegations and Ms. Lienczewski was incredibly uncomfortable at her own children's open house.

453. It was extremely distressing for Ms. Lienczewski to face both people who knew about the allegations as well as those who either did not know about the allegations, or did not believe

them, that were asking about Ms. Lienczewski being assigned to their (or their kids) classrooms – where Ms. Lienczewski had to explain she was not returning.

454. Adding to the humiliation and feeling of discrimination and retaliation, soon after the open house, while at her son's varsity football game for Swansea public schools Ms. Lienczewski was approached by Grant Hajder who was her colleague that was out on paid administrative leave for allegations of abuse (without a video to exonerate him).

455. Ms. Lienczewski spoke to Grant Hajder, who confirmed that – as differential treatment and more evidence of pretext – that he was not pushed to resign or threatened to be terminated if he did not resign, sign an NDA, admit the school had no liability, and sign a general waiver releasing all claims against the school.

456. Instead, at this football game, Grant Hajder told Plaintiff he got his "life back" and returned to school beginning of the school year and that he had returned back to work full time with his old regular schedule.

457. Plaintiff specifically asked Grant Hajder if the union president ever asked if he resign and he said absolutely not or ever suggested he seek employment elsewhere.

458. Further, Ms. Lienczewski feels the school is retaliating against her children in its school district and think, upon complaint, not properly addressing the issues, punishing her children.

459. Ms. Lienczewski's children are being targeted, and/or their issues ignored; for example, Plaintiff's 6th grade son with special needs, who has an IEP, was punished due to his disabilities.

460. Worse, Ms. Lienczewski's son was threatened with detention for unjust reasons.

461. When Ms. Lienczewski complained to the Assistant Principal Mr. Kelly, she received no response from Mr. Kelly.

462. Instead of a response from the Assistant Principal, Plaintiff only heard from the Math teacher who had disciplined Plaintiff's young son; in this communication, this teacher admitted that he had not even read the child's IEP.

463. Plaintiff's young son was traumatized when he came home and had no idea why he was in trouble and was just begging Ms. Lienczewski to sign the sheet so he did not have detention.

464. Notably, Plaintiff's 6th grade son asked if he "was being punished because of [Ms. Lienczewski] and that [she] used to work" there.

465. Plaintiff continues to be anxious to deal with her children's school (and former employer) and continues to suffer public humiliation in her town and when forced to go to her children's school, due to the false allegations.

466. Ms. Lienczewski is fearful of going in public and can barely go into her own children's school due to anxiety.

467. Further, there are others that do not know Ms. Lienczewski well, in the community, that Ms. Lienczewski can tell know about the allegations about her and may gossip about it or believe it, which makes her uncomfortable to be in public.

468. In short, Ms. Lienczewski has faced enormous and ongoing financial stress, having had difficulty finding a job and when she did, she had to find a job in a district that was a significant commute and where Ms. Lienczewski had to be walked out by a security guard, making her not feel safe especially after becoming pregnant again, fearing what would come based on past experiences, and reliving being walked in on by two men.

469. Ms. Lienczewski had to take the job at a new school, not near her town, because she figured no one would be aware of the false allegations.

470. Then Ms. Lienczewski found out she was pregnant again and feared living through the same hellacious circumstances at this new school job.

471.  Specifically as to the increased anxiety her new pregnancy caused at her new job, during her tenure in her new job, which was uncomfortable enough due to fear of allegations coming out and having a lack of safety at work, Ms. Lienczewski feared dealing with pumping in a new school, which created extreme anxiety.

472.  Plaintiff feels like she is constantly reliving being walked in on at Swansea.

473.  Further her new job did not have the safety level her prior job did.

474.  Due to the prior trauma, the stated ongoing stress of having to go through the pumping and FMLA issues she had with Defendants, due to safety fears while pregnant at this new school, as well as the comparative long commute, in December of 2025, Ms. Lienczewski could not continue that job with the support of her treatment providers.

475.  Thus, Ms. Lienczewski has lost substantial income and other benefits.

476.  Moreover, the emotional distress has been extreme and is ongoing due to all of the above.

477.  In fact, as noted, Ms. Lienczewski has been on medication and has been in therapy due to these events caused by Defendants.

478.  As a direct and proximate result of her employer's actions and omissions, Ms. Lienczewski suffered loss of income, loss of earning potential, loss of benefits and other economic harm; experienced humiliation and loss of standing in the community as well as *substantial* harm to her reputation; and suffered and continues to suffer from emotional distress and mental anguish. All damage continues to date.

## COUNT ONE
## VIOLATION OF FMLA - RETALIATION

*Violation of the Family and Medical Leave Act 29 U.S.C. § 2615 (FMLA) and the Massachusetts Family and Medical Leave Act (FMLA)*

### As to Defendants:

***Swansea School District, Swansea School Committee, Town of Swansea, JCJHS Principal Robert Silveira, Mr. Sean Scanlon, School District Director of Student Services, Superintendent Mr. Scott Holcomb***

479.  Paragraphs 1 – 478 are hereby incorporated by reference in their entirety as if fully stated herein.

480.  Plaintiff was protected from retaliation for exercising her rights under FMLA and the state analog.

481.  One of those protections was from interference with her FMLA.

482.  Yet, Plaintiff was contacted and urged to return from FMLA early.

483.  That constitutes FMLA interference.

484.  Further, Defendants also committed FMLA retaliation.

485.  Plaintiff's job was protected and upon her return to work after FMLA, she was entitled to the same or substantially similar job as well.

486.  Plaintiff was retaliated against for exercising her rights to take protected leave, as described above, including but not exclusive to changing Plaintiff's schedule to that of a floater.

487.  Further, as to retaliation, Defendants made her work intolerable with difficulties regarding getting an accommodation to express milk and then the false allegations about Plaintiff being abusive towards a student less than a month after returning from FMLA.

488.  Defendants otherwise violated *inter alia*, FMLA and the state analog, by not offering Plaintiff the same or a substantially similar job to return to.

489.  Defendants otherwise retaliated *inter alia*, FMLA and the state analog, by retaliating against Plaintiff for her FMLA leave by the acts and omissions alleged above.

490.    Defendants' and its agents' aforesaid conduct retaliating against Plaintiff for exercising her rights was willful conduct and/or conduct in reckless disregard of whether the conduct was prohibited.

491.    Plaintiff was damaged as a direct and proximate result of Defendants' and its agents' intentional conduct in the ways aforesaid.

492.    Because Defendants' conduct was intentional, constitutes gross negligence, recklessness, and was willful and/or wanton, punitive or exemplary damages are warranted.

493.    Defendants is responsible for its agents' acts and omissions under the theory of *Respondeat superior*.

**COUNT TWO**
**42 U.S.C. § 1983 CONSTITUTIONAL VIOLATIONS – SUBSTANTIVE DUE PROCESS FOR LIBERTY INTEREST**
*United States Constitution Substantive Due Process – Liberty Interest and Right to Reputation under the Fifth and Fourteenth Amendment, 42 U.S.C. § 1983, and Commonwealth of Massachusetts Constitution*
**As to Defendants:**
***Swansea School District, Swansea School Committee, Town of Swansea, JCJHS Principal Robert Silveira, Mr. Sean Scanlon, School District Director of Student Services, Superintendent Mr. Scott Holcomb***

494.    Paragraphs 1 – 478 are hereby incorporated by reference in their entirety as if fully stated herein.

495.    Plaintiff has a fundamental right to, and liberty interest in, her reputation and the right to be free from government interference in the same.

496.    Defendants and their agents are state actors who, at all times relevant, acted under color of state authority.

497.    The Fifth and Fourteenth Amendment of the United States Constitution, Civil Rights Act of 1871, 42 U.S.C. § 1983, and the Commonwealth of Massachusetts Constitution provide that no person shall be deprived of liberty or property without due process of law.

498. The aforesaid Constitutional provisions protect individuals from deprivations of rights protected by the Constitutions of the United States and Massachusetts, committed by state actors persons acting under the color of state authority.

499. The aforesaid Constitution provisions and statute protects individuals from violations of rights protected by the Constitution or laws of the United States and Rhode Island that are committed by persons acting under the color of state authority.

500. Defendants made numerous false statements about Plaintiff and her job competence, made false accusations about Plaintiff's treatment of a child, published statements about the same, threatened to report Plaintiff to DCYF if she did not quit, sign a NDA, admit the school had no liability, and sign a general release.

501. The false statements placed Plaintiff's reputation in an unfavorable light.

502. Plaintiff was deprived of her liberty interest in her reputation because of Defendants' actions and omissions.

503. Therefore, Defendants deprived Plaintiff of a substantive liberty interest without due process of law, in violation of the right guaranteed by the Fifth and Fourteenth Amendment to the United States Constitution, actionable under 42 U.S.C. § 1983, and in violation of rights guaranteed under the Commonwealth of Massachusetts Constitutions.

504. Defendants are state actors at all times relevant.

505. Defendants were acting under the color of state authority at all times relevant.

506. The statements about Plaintiff were levied without care or deliberation.

507. Defendants' agents' actions that resulted in deprivations were acts that shock the conscience.

508. Plaintiffs seek redress for violations constitutionally protected interests and rights committed by Defendants while acting under the color of state law.

509.  Defendants' agents' actions were intentional and/or reckless; they were taken for the purpose of causing a deprivation of Plaintiff's stated liberty interest secured by the United State and Massachusetts Constitutions and in reckless disregard of Plaintiff's substantive due process rights.

510.  Plaintiff experienced the damages aforesaid as a proximate result of Defendants' agents' intentional conduct.

511.  Because Defendants' conduct was intentional, willful and/or wanton, punitive or exemplary damages are warranted.

512.  Defendants are liable for the actions of their agents, employees, and officers and under *Respondeat Superior*.


### COUNT THREE
### 42 U.S.C. § 1983 CONSTITUTIONAL VIOLATIONS – PROCEEDURAL DUE PROCESS
*United States Constitution Procedural Due Process under the Fifth and Fourteenth Amendment, 42 U.S.C. § 1983, and Commonwealth of Massachusetts Constitution*
### As to Defendants:
***Swansea School District, Swansea School Committee, Town of Swansea, JCJHS Principal Robert Silveira, Mr. Sean Scanlon, School District Director of Student Services, Superintendent Mr. Scott Holcomb***

513. Paragraphs 1 – 478 are hereby incorporated by reference in their entirety as if fully stated herein.

514.    Defendants and their agents are state actors who, at all times relevant, acted under color of state authority.

515.  Plaintiff has a fundamental right to, and liberty interest in, her reputation and the right to be free from government interference in the same.

516.  The Fifth and Fourteenth Amendment of the United States Constitution, Civil Rights Act of 1871, 42 U.S.C. § 1983, and the Commonwealth of Massachusetts Constitution provide that no person shall be deprived of liberty or property without due process of law.

517. The aforesaid Constitutional provisions protect individuals from deprivations of rights protected by the Constitutions of the United States and Massachusetts, committed by state actors persons acting under the color of state authority.

518. The aforesaid Constitution provisions and statute protects individuals from violations of rights protected by the Constitution or laws of the United States and Rhode Island that are committed by persons acting under the color of state authority.

519. Plaintiff was deprived of notice that she was going to be forced out of her Superintendent position and placed on administrative leave.

520. Plaintiff was deprived of an opportunity to be heard prior to being forced out of her Superintendent position and placed on administrative leave.

521. Plaintiff was deprived of an impartial tribunal prior to Defendants forcing her out of her Superintendent position and placing her on administrative leave

522. Plaintiff was therefore deprived of her procedural due process rights.

523. Therefore, Defendants violated the Fifth and Fourteenth Amendment to the United States Constitution, actionable under 42 U.S.C. § 1983, and in violation of rights guaranteed under Article 1, Section 2 of the Rhode Island Constitution.

524. Plaintiffs seek redress for Defendants' Constitutional violations while acting under the color of state law.

525. Plaintiff experienced the damages aforesaid as a proximate result of Defendants' agents' intentional conduct.

526. Defendants' agents' actions were intentional and/or reckless.

527. Because Defendants' conduct was intentional, willful and/or wanton, punitive or exemplary damages are warranted.

528. Defendants are liable for the actions of their agents, employees, and officers.

**COUNT FOUR**
**42 U.S.C. § 1983 CONSTITUTIONAL VIOLATIONS – EQUAL PROTECTION**
*United States Constitution Equal Protection under the Fifth and Fourteenth Amendment, 42 U.S.C. §*
*1983, and Commonwealth of Massachusetts Constitution*
**As to Defendants:**
**Swansea School District, Swansea School Committee, Town of Swansea, JCJHS Principal Robert**
**Silveira, Mr. Sean Scanlon, School District Director of Student Services, Superintendent Mr. Scott**
**Holcomb**

529. Paragraphs 1 – 478 are hereby incorporated by reference in their entirety as if fully stated

herein.

530. Defendants and their agents are state actors who, at all times relevant, acted under color of

state authority.

531. Plaintiff falls within a protected class.

532. Plaintiff was singled out by the government and was the specter of arbitrary classification and

differential treatment.

533. Similarly-situated employees were not singled out, as Plaintiff was, for adverse and differential

treatment.

534. Thus, Defendants, by their actions and/or omissions, have deprived Plaintiff of her equal

protection rights guaranteed under Article 1, Section 2 of the State Constitution and the Fifth

and Fourteenth Amendments of the federal Constitution and the Commonwealth of

Massachusetts Constitution.

535. Plaintiffs seek redress for constitutional violations.

536. Defendants' agents' actions were intentional and/or reckless.

537. Because Defendants' conduct was intentional, willful and/or wanton, punitive or exemplary

damages are warranted.

538. Plaintiff experienced the damages aforesaid as a proximate result of Defendants' agents'

intentional conduct.

539. Defendants are liable for the actions of their agents, employees, and officers.

**COUNT FIVE**
*GENDER/SEX AND PREGNANCY-RELATED MEDICAL CONDITION HARASSMENT /
DISCRIMINATION – DISCRIMINATORY TERMS AND CONDITIONS
GENDER/SEX – SEXUAL HARASSMENT
GENDER/SEX AND PREGNANCY-RELATED MEDICAL CONDITION HARASSMENT /
DISCRIMINATION - DISCRIMINATORY CONSTRUCTIVE DISCHARGE*
**Violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2 ("Title VII"), The
Pregnancy Discrimination Act of 1978, codified in 42 USC § 2000e (k) ("PDA")
Violation of Mass. General Laws c.151B § 4 ("151B")
As to Defendants:
Swansea School District, Swansea School Committee, Town of Swansea _only_**

540. Paragraphs 1 – 478 are hereby incorporated by reference in their entirety as if fully stated herein.

541. Plaintiff is afforded protections from sexual and gender-related harassment and discrimination, and thereby her sex, under Title VII, the PDA, and M.G.L. c.151B.

542. Defendant subjected Plaintiff to severe and pervasive sexual harassment and disparate treatment, as well as an unresolved hostile work environment, which altered the terms and conditions of her employment.

543. Defendant knew of the harassing and discriminatory conduct but failed to take swift or remedial action in violation of, inter alia, Title VII, the PDA, and M.G.L. c.151B.

544. Defendants' agents created such a hostile work environment that no reasonable person could have remained in that job; as a result, Plaintiff was constructively discharged due to Defendants' discrimination.

545. Defendant constructively discharged Plaintiff because of her gender/sex.

546. Alternately, Defendants effectively terminated Plaintiff as alleged above well before her forced constructive discharge.

547. But for Defendants' discriminatory conduct, Plaintiff would not have been constructively discharged.

548. Plaintiff experienced the aforesaid and incorporated damages as a direct and proximate result of Defendants' intentional, unlawful conduct.

549. Defendants' discriminatory conduct, policies, and practices were intentionally discriminatory, motivated by animus, impermissible, and unlawful considerations and violate, inter alia, Title VII , the PDA, and M.G.L. c.151B.

550. Because Defendants' conduct was intentional, constituted gross negligence, recklessness, and was willful and/or wanton, punitive or exemplary damages are warranted.

551. Plaintiff experienced the damages aforesaid as a proximate result of Defendants' agents' intentional conduct.

552. Defendants are vicariously responsible for the acts and omissions of its agents under the doctrine of respondeat superior.

**COUNT SIX**
*GENDER/SEX AND PREGNANCY-RELATED MEDICAL CONDITION HARASSMENT /*
*DISCRIMINATION – DISCRIMINATORY TERMS AND CONDITIONS*
*GENDER/SEX – SEXUAL HARASSMENT*
*GENDER/SEX AND PREGNANCY-RELATED MEDICAL CONDITION HARASSMENT*
*DISCRIMINATION - DISCRIMINATORY TERMINATION*
***Violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2 ("Title VII"), The***
***Pregnancy Discrimination Act of 1978, codified in 42 USC § 2000e (k) ("PDA"),***
***Violation of Mass. General Laws c.151B § 4 ("151B")***
**As to Defendants:**
***Swansea School District, Swansea School Committee, Town of Swansea* <u>*only*</u>**

553. Paragraphs 1 – 478 are hereby incorporated by reference in their entirety as if fully stated herein.

554. Plaintiff is afforded protections from sexual and gender-related harassment and discrimination, and thereby her sex, under Title VII, the PDA and M.G.L. c.151B.

555. Defendant subjected Plaintiff to severe and pervasive sexual harassment and disparate treatment, as well as an unresolved hostile work environment, which altered the terms and conditions of her employment.

556. Defendant knew of the harassing and discriminatory conduct but failed to take swift or remedial action in violation of, inter alia, Title VII, the PDA, and M.G.L. c.151B.

557. Defendant left Plaintiff out on administrative leave and Defendant, as well as the union, pushed Plaintiff to resign or she would be reported to DCYF and not have her unemployment supported by Defendant.

558. Effectively, Plaintiff was terminated because of her gender/sex and/or pregnancy-related medical condition.

559. But for Defendants' discriminatory conduct, Plaintiff would not have been terminated.

560. Plaintiff experienced the aforesaid and incorporated damages as a direct and proximate result of Defendants' intentional, unlawful conduct.

561. Defendants' discriminatory conduct, policies, and practices were intentionally discriminatory, motivated by animus, impermissible, and unlawful considerations and violate, inter alia, Title VII, the PDA, and M.G.L. c.151B.

562. Because Defendants' conduct was intentional, constituted gross negligence, recklessness, and was willful and/or wanton, punitive or exemplary damages are warranted.

563. Plaintiff experienced the damages aforesaid as a proximate result of Defendants' agents' intentional conduct.

564. Defendant Swansea Public Schools is vicariously responsible for the acts and omissions of its agents under the doctrine of respondeat superior.

**COUNT SEVEN**
*GENDER/SEX AND PREGNANCY-RELATED MEDICAL CONDITION HARASSMENT /
RETALIATION – RETALIATORY TERMS AND CONDITIONS
GENDER/SEX – SEXUAL HARASSMENT
GENDER/SEX AND PREGNANCY-RELATED MEDICAL CONDITION HARASSMENT /
RETALIATION - RETALIATORY CONSTRUCTIVE DISCHARGE*
***Violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-3, The Pregnancy
Discrimination Act of 1978, codified in 42 USC § 2000e (k) ("PDA"),***

### *Violation of Mass. General Laws c.151B § 4 ("151B § 4")*
### As to Defendants:
### *Swansea School District, Swansea School Committee, Town of Swansea <u>only</u>*

565. Paragraphs 1 – 478 are hereby incorporated by reference in their entirety as if fully stated herein.

566. Plaintiff was protected from retaliatory harassment, discrimination, and termination as a result of engaging in protected conduct under Title VII, the PDA, and M.G.L. c.151B.

567. Plaintiff engaged in protected conduct, opposed unlawful conduct, and exercised her rights under Title VII, the PDA, and M.G.L. c.151B.

568. Specifically, Plaintiff reported sexually harassing comments, gender-based discrimination, sexual harassment by men walking in while she was pumping, and the failure to accommodate her lactation-related needs to leadership, all of which are protected under Title VII, the PDA, and M.G.L. c.151B.

569. As a result of Plaintiff's protected activity, and specifically because of retaliation for her reports of her gender/sex and/or pregnancy-related medical condition, Plaintiff was subjected to retaliatory treatment by Defendants' agents, including adverse changes to the terms and conditions of her employment.

570. Additionally, as a result of Plaintiff's protected activity, Defendants' agents created such a hostile work environment that no reasonable person could have remained in that job; as a result, Plaintiff was constructively discharged due to Defendants' retaliation.

571. But for Defendants' retaliatory conduct, Plaintiff would not have been constructively discharged.

572. Defendants' retaliatory conduct, policies, and practices were intentionally retaliatory, motivated by animus, impermissible, and unlawful considerations and violate, inter alia, Title VII, the PDA, and M.G.L. c.151B.

573. Because Defendants' conduct was intentional, constituted gross negligence, recklessness, and was willful and/or wanton, punitive or exemplary damages are warranted.

574. Plaintiff experienced the damages aforesaid as a proximate result of Defendants' agents' intentional conduct.

575. Defendant Swansea Public Schools is vicariously responsible for the acts and omissions of its agents under the doctrine of respondeat superior.

**COUNT EIGHT**
*GENDER/SEX AND PREGNANCY-RELATED MEDICAL CONDITION HARASSMENT /
RETALIATION – RETALIATORY TERMS AND CONDITIONS
GENDER/SEX – SEXUAL HARASSMENT
GENDER/SEX AND PREGNANCY-RELATED MEDICAL CONDITION HARASSMENT /
RETALIATION - RETALIATORY TERMINATION*
***Violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-3, The Pregnancy
Discrimination Act of 1978, codified in 42 USC § 2000e (k) ("PDA"),
Violation of Mass. General Laws c.151B § 4 ("151B § 4")
As to Defendants:
Swansea School District, Swansea School Committee, Town of Swansea only***

576. Paragraphs 1 – 478 are hereby incorporated by reference in their entirety as if fully stated herein.

577. Plaintiff was protected from retaliatory harassment, discrimination, and termination as a result of engaging in protected conduct under Title VII, the PDA, and M.G.L. c.151B.

578. Plaintiff engaged in protected conduct, opposed unlawful conduct, and exercised her rights under Title VII, the PDA, and M.G.L. c.151B.

579. Specifically, Plaintiff reported sexually harassing comments, gender-based discrimination, sexual harassment by men walking in while she was pumping, and the failure to accommodate her lactation-related needs to leadership, all of which are protected under Title VII, the PDA, and M.G.L. c.151B.

580. As a result of Plaintiff's protected activity, Plaintiff was subjected to retaliatory treatment by Defendants' agents, including adverse changes to the terms and conditions of her employment.

581. Additionally, as a result of Plaintiff's protected activity, Defendants' agents created a hostile work environment.

582. Defendant left Plaintiff out on administrative leave and Defendant, as well as the union, pushed Plaintiff to resign or she would be reported to DCYF and not have her unemployment supported by Defendant.

583. Effectively, Plaintiff was terminated because of retaliation for her reports of her gender/sex and/or pregnancy-related medical condition.

584. But for Defendants' discriminatory conduct, Plaintiff would not terminated.

585. Defendants' retaliatory conduct, policies, and practices were intentionally retaliatory, motivated by animus, impermissible, and unlawful considerations and violate, inter alia, Title VII, the PDA, and M.G.L. c.151B.

586. Because Defendants' conduct was intentional, constituted gross negligence, recklessness, and was willful and/or wanton, punitive or exemplary damages are warranted.

587. Plaintiff experienced the damages aforesaid as a proximate result of Defendants' agents' intentional conduct.

588. Defendant Swansea Public Schools is vicariously responsible for the acts and omissions of its agents under the doctrine of respondeat superior.

**COUNT NINE**
*PREGNANCY-RELATED MEDICAL CONDITION DISCRIMINATION – FAILURE TO*
*ACCOMMODATE PREGNANCY-RELATED MEDICAL CONDITION*
*Violation of Mass. General Laws c.151B § 4 ("151B § 4)*
**As to Defendants:**
***Swansea School District, Swansea School Committee, Town of Swansea* <u>*only*</u>**

589. Paragraphs 1 – 478 are hereby incorporated by reference in their entirety as if fully stated herein.

590. Massachusetts General Laws c.151B § 4 mandates that employers provide reasonable accommodations for lactation or the need to express breast milk for a nursing child, including more frequent or longer paid or unpaid breaks and private non-bathroom space for expressing breast milk.

591. Plaintiff therefore, was entitled to a private, sanitary space to pump, as well as allowed to have the time to express breast milk, even if this takes longer than the typical break, pursuant to Mass. Gen. Laws c.151B § 4.

592. Defendant failed to provide reasonable accommodations for Plaintiff's pregnancy-related medical condition, in violation of Mass. Gen. Laws c.151B § 4(a), which makes it an unlawful practice for an employer to deny a reasonable accommodation for an employee's pregnancy or a condition related to pregnancy, including but not limited to lactation or the need to express breast milk for a nursing child, unless the employer can demonstrate undue hardship.

593. Reasonable accommodations under § 4 include, but are not limited to, more frequent or longer breaks, a modified work schedule, private non-bathroom space for expressing breast milk, and job restructuring.

594. Defendant failed to provide Plaintiff with such reasonable accommodations.

595. In fact, both the principal and another man walked in on Plaintiff while she was expressing milk, and lingered in a sexually harassing manner.

596. Defendant knew of Plaintiff's need for accommodation but failed to take swift, remedial action, and failed any 'interactive' process to plan the accommodations, instead permitting and perpetuating discriminatory treatment against Plaintiff.

597. Defendants' discriminatory conduct, policies, and practices were intentionally discriminatory, motivated by animus, impermissible, and unlawful considerations, and in direct violation of Mass. Gen. Laws c.151B § 4.

598. Plaintiff experienced the damages aforesaid as a direct proximate result of Defendants' agents' intentional conduct.

599. Because Defendants' conduct was intentional, constitutes gross negligence, recklessness, and was willful and/or wanton, punitive or exemplary damages are warranted.

600. Defendant is vicariously responsible for the acts and omissions of its agents under the doctrine of respondeat superior.

**COUNT TEN**
**DEFEMATION PER SE**
**As to Defendants:**
*All Defendants*

601. Paragraphs 1 – 478 are hereby incorporated by reference in their entirety as if fully stated herein.

602. Defendants' agents published and republished, orally and/or in writing, false statements concerning Plaintiff as stated *supra.*

603. The aforesaid statements were published to third parties.

604. Defendants' agents published these statements in the course of performing their duties while employed and/or elected to represent the public of the entity-Defendants, and while on the government-entity Defendants' premises.

605. Defendants' agents published false written and oral statements with knowledge that they were false and in reckless disregard of the truth of the statements.

606. Defendants' agents published false written and oral statements negligently disregarding the truth of the statements.

607. These false statements are of the type that a reasonable person would find to be of the character that would harm Plaintiff's professional reputation, standing in the community, and her career as a Superintendent/school district leader, as well as of the character that would cause both reputational and economic harm.

608. Defendants' agents published the false statements despite foreseeability that such published false statements would cause economic harm and damage to Plaintiff's reputation, would lower the estimation of Plaintiff in the community and in her career, and would be understood by the

64

party receiving the publication of the false statements that such a statement would harm Plaintiff.

609. Parties receiving the publication did, in fact, understand the publication as a statement that would in fact actually harm Plaintiff's reputation and cause economic and other damage to Plaintiff.

610. Defendants' agents' that published, republished, and received the statements in oral or written form did not have a 'need to know.'

611. The published statements did in fact harm Plaintiff.

612. Plaintiff experienced the damages aforesaid as a proximate result of Defendants' agents' intentional conduct.

613. The false published statements were related to and impacted Plaintiff's career or vocation.

614. Thus, presumed damages for defamation/slander *per se* are proper.

615. Because Defendants' conduct was intentional, willful and/or wanton, punitive or exemplary damages are warranted.

616. Defendants are responsible for the acts and omissions of the Defendants' agents under the theory of Respondeat superior.

**COUNT ELEVEN**
**INTERFERENCE WITH CONTRACTUAL/EMPLOYMENT RELATIONSHIP**
**As to Defendants:**
*Swansea Educator's Association, Inc., Frank Murphy <u>Only</u>*

617. Paragraphs 1 – 478 are hereby incorporated by reference in their entirety as if fully stated herein.

618. Plaintiff had an advantageous relationship with Swansea School District.

619. Union Defendants knowingly induced a decline of, and then a breaking of that relationship.

620. Union Defendants' interference with the relationship, in addition to being intentional, was borne of improper motive or means.

621. Plaintiff was harmed by the Union Defendants' actions.

622. Union Defendants knew or should have known that their actions would result in Plaintiff's removal from her position as Superintendent, her termination and/or her constructive discharge, alleged above.

623. Union Defendants knew or should have known that their actions would result in Plaintiff being removed from work and placed on administrative leave, and then terminated/constructively discharged, as alleged above.

624. Union Defendants' interference with Plaintiff's employment relationship was therefore intentional.

625. Union Defendants' interference with Plaintiff's employment contract was therefore intentional.

626. Union Defendants' interference was improper in motive or as alleged above.

627. As a result of these unlawful actions, Plaintiff was harmed economically by the loss of her position, her current employment term, her renewal employment term, her compensation, her reputation, future job opportunities, and her career as a Superintendent in Pawtucket or another school district.

628. Plaintiff experienced the economic and other damages as a proximate result of Union Defendants and its/their agents' intentional conduct.

629. Because Union Defendants' conduct was intentional, constitutes gross negligence, recklessness, and was willful and/or wanton, punitive or exemplary damages are warranted.

630. Union Defendants are vicariously responsible for all aforesaid liability to Plaintiff, through the acts and omissions of its agents, under Respondeat Superior.

**COUNT TWELVE**
**INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**
**As to Defendants:**
***All Defendants***

631. Paragraphs 1 – 478 are hereby incorporated by reference in their entirety as if fully stated herein.

632. All Defendants acted intentionally to inflict severe emotional distress upon Plaintiff by the acts and omissions alleged *supra.*

633. All Defendants acted recklessly to cause Plaintiff severe emotional distress by the acts and omissions alleged *supra.*

634. All Defendants' acts and omissions, alleged *supra,* were extreme and outrageous*.*

635.  All Defendants' conduct caused severe emotional distress.

636. But for Defendants' conduct, Plaintiff would not have experienced severe emotional distress.

637. Plaintiff experienced the damages aforesaid as a proximate result of Defendant's agents' intentional conduct.

638. Defendants, by its intentional acts, caused severe emotional distress to Plaintiff, who, as a result, experienced physical symptoms from the distress.

639. Because Defendants' conduct was intentional, constitutes gross negligence, recklessness, and was willful and/or wanton, punitive or exemplary damages are warranted.

640. Defendants are vicariously responsible for the acts and omissions of its agents under *Respondeat Superior*.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays that this Court:

a.    Order judgment for Plaintiff against Defendant on all Counts of the Complaint and declare that the practices detailed in this Complaint are unlawful;

b.   Order, for all applicable Counts, that Defendant make Plaintiff whole by awarding appropriate back pay with interest, front pay, compensation for all other lost income and benefits, earning capacity, and all other relevant entitlements and emoluments;

c.   Order, for all applicable Counts, that Plaintiff be awarded an amount of money which will fairly compensate her for her mental anguish, emotional pain and suffering, damage to his reputation, loss of standing in the community, and other damages incurred;

d.   Order, for all applicable Counts, that Plaintiff be awarded an amount of money which will fairly compensate her for her medical costs and related damages incurred;

e.   Order, for all applicable Counts, that the Defendant pay Plaintiff's costs and reasonable attorney's fees resulting from this action;

f.   Order, for all applicable Counts, that the Defendant pay punitive or exemplary damages, as appropriate to punish Defendant for its malicious conduct, reckless conduct, and/or callous indifference to the statutorily and common law protected rights of Plaintiff;

g.   Order, for all applicable Counts, that Defendant pay pre-judgement, including interest for all damages awarded to Plaintiff from the date the cause of action accrued, and post-judgment interest where appropriate and allowable by law;

h.   Retain jurisdiction of this action to ensure full compliance; and

i.   Order, for all Counts, such other relief to Plaintiff as this Court deems just and proper.

## <u>DEMAND FOR JURY TRIAL</u>

### *PLAINTIFF DEMANDS A TRIAL BY JURY ON ALL ISSUES SO TRIABLE*

February 12, 2026

Respectfully Submitted by Plaintiff,
PLAINTIFF AMBER LIENCZEWSKI,
By her attorney,

 /s/ Paige Munro-Delotto
Paige Munro-Delotto, Ph.D., Esq.
BBO# 690605
Munro-Delotto Law, LLC
400 Westminster Street, Suite 200
Providence, RI 02903
(401) 521-4529
(401) 264-8035 (fax)
Email: Paige@pmdlawoffices.com

## CERTIFICATE OF SERVICE

I hereby certify that on February 12, 2026, I electronically filed the herein documents with the United States District Court for the District of Massachusetts by using the *CM/ECF* system. I further certify that all counsel of record are registered as CM/ECF Filers and that they will be served by the *CM/ECF* system and will be served through counsel as well.

   /s/ Paige Munro-Delotto

Paige Munro-Delotto, Ph.D., Esq.